PEOPLE v FOX (AFTER REMAND)

Docket No. 198890. Submitted November 3, 1998, at Grand Rapids. Decided November 20, 1998, at 9:05 A.M. Leave to appeal sought.

Jason M. Fox was convicted by a jury in the Mason Circuit Court of escape from jail while awaiting trial for a felony, of malicious destruction of police property, and of breaking and entering a building with intent to commit a felony. The testimony at trial established that a pane of glass in the exterior window of the cell that the defendant and others occupied had been broken, apparently from the inside, and that there were fresh cuts, apparently made by a hacksaw blade, on the bars of the window. It was also discovered that the perimeter fence surrounding the jail had been cut at a spot across from the window of the defendant's cell, so that the fence could be opened like a door. There was testimony by various other prisoners that the defendant broke out the window pane, that someone had handed something through the opening to the defendant, that the defendant had been observed trying to cut through the bars, and that the defendant had indicated that he intended to escape through the window. During the jury's deliberations, the defense counsel indicated to the court that after the prosecution had rested he had been supplied with materials relating to two statements given to the police by another prisoner, the first being to the effect that the prisoner had observed three individuals cut through the perimeter fence and pass things into the cellblock through the broken window and the second indicating that the prisoner had not been an eyewitness to the incident but had overheard conversations concerning the escape. The defense counsel argued that despite the inculpatory nature of the prisoner's statements, the defendant was prejudiced by the failure of the prosecution to provide the defense with these materials in a timely manner. The court, Richard I. Cooper, J., concluded that the defendant had not been prejudiced and denied any relief. The defendant appealed. The Court of Appeals, retaining jurisdiction, ordered the matter remanded to the trial court for the purpose of the making of a motion for a new trial. The trial court denied the motion for a new trial, concluding that the defendant's due process rights had not

been violated by the belated delivery of the materials relating to the statements made to the police by the prisoner, that there was sufficient evidence to support the conviction of malicious destruction of police property, that the convictions had not resulted in double jeopardy, and that there was no juror misconduct mandating reversal of the convictions.

After remand, the Court of Appeals *held*:

1. The defendant's assertion that he was denied due process by the prosecution's withholding of exculpatory information is without merit. The alleged exculpatory information consisted of interviews and notes of police investigators that, for the most part, would have been inadmissible hearsay if the defense had tried to use them at trial. The documents contain very little, if any, admissible evidence that is even arguably exculpatory, and the defendant has made no specific claims regarding the actual effect the late delivery of those documents had on the formulation of his defense.

2. The record fails to support the defendant's assertion that he was prejudiced by the prosecution's initial inclusion on its witness list of the prisoner who gave the two statements that were included among the late-delivered documents and members of that prisoner's family, only to be followed by the deletion of those names from the witness list just before trial. The trial court found, and the record supports, that the removal of those persons from the witness list was because they had recanted their statements and because of the inconsistencies in the stories told by the prisoner and his family.

3. Because the jury was fully informed that the defendant denied involvement in the attempted jail escape, the defendant was not prejudiced by the late delivery of an audio tape and the purported transcription of a conversation on that tape between the defendant and a prisoner who was wearing a concealed radio transmitter, a conversation in which the defendant disavowed knowledge of the attempted escape. Further, the defendant's Fifth Amendment right against self-incrimination was not violated by use of the radio transmitter under these circumstances.

4. The defendant was convicted of destruction of police property under the provisions of MCL 750.337b; MSA 28.609(2), which clearly makes the wilful and malicious destruction or injury of the personal property of a police department a felony. Because the statute clearly speaks only of the personal property of the police and the window that was the subject of this charge was part of the jail building and thus real property, the trial court erred in holding that the evidence adduced at trial supported the conviction of

destruction of police property. Accordingly, the conviction of destruction of police property must be vacated.

5. The defendant's conviction of both jail escape and breaking and entering with intent to commit a felony, the predicate felony of which being the jail escape, does not violate the constitutional prohibition against double jeopardy on the basis of multiple punishments for the same offense. The constitutional protection against double jeopardy on the basis of multiple punishments for the same offense is a restriction on a court's ability to impose punishment in excess of that intended by the Legislature, not a restriction on the Legislature's power to establish punishment. Because the offense of jail escape and the offense of breaking and entering involve violation of distinct societal norms, there is no indication that the Legislature intended the offense of jail escape to be subsumed in the offense of breaking and entering. Accordingly, the offenses may be considered to be separate and subject to multiple punishment, and there is no violation of the prohibition against double jeopardy.

6. The trial court did not abuse its discretion in denying the defendant's motion for a new trial based on the failure of two jurors to acknowledge during voir dire that they were acquainted at work with each other and a third juror, inasmuch as the defendant failed to demonstrate the jurors' impartiality was impaired by the fact that they had a common employer.

Vacated in part and affirmed in part.

1. CRIMINAL LAW — DESTRUCTION OF POLICE PROPERTY — JAIL WINDOWS.

The wilful and malicious destruction of a jail window will not support a conviction of the felony of destruction of personal property of a police department, a jail window being real property rather than personal property and the statute specifically limiting its scope to the destruction of personal property (MCL 750.337b; MSA 28.609[2]).

2. CONSTITUTIONAL LAW — DOUBLE JEOPARDY — CRIMINAL LAW.

The constitutional protection against double jeopardy on the basis of multiple punishments for the same offense is a restriction on a court's ability to impose punishment in excess of that intended by the Legislature, not a restriction on the Legislature's power to establish punishment (US Const, Am V; Const 1963, art 1, § 15).

3. CONSTITUTIONAL LAW — DOUBLE JEOPARDY — JAIL ESCAPE — BREAKING AND ENTERING WITH INTENT TO COMMIT A FELONY.

The conviction both of the offense of jail escape and of the offense of breaking and entering with intent to commit a felony, where the

predicate offense of the breaking and entering charge is the jail escape, does not violate the constitutional prohibition against double jeopardy; there is no indication that the Legislature did not intend that these two offenses should not be considered to be separate and distinct and subject to separate conviction and punishment (US Const, Am V; Const 1963, art 1, § 15; MCL 750.110, 750.197[2]; MSA 28.305, 28.394[2]).

*Frank J. Kelley*, Attorney General, *Thomas L. Casey*, Solicitor General, *Cris VanOosterum*, Prosecuting Attorney, *Carole F. Barnett-Stopper*, Assistant Attorney General, for the people.

*J. Nicholas Bostic*, for the defendant.

AFTER REMAND

Before: Wʜɪᴛʙᴇᴄᴋ, P.J., and Cᴀᴠᴀɴᴀɢʜ and Nᴇғғ, JJ.

Cᴀᴠᴀɴᴀɢʜ, J. Defendant was convicted by a jury of escape while awaiting trial for a felony, MCL 750.197(2); MSA 28.394(2), of malicious destruction of police property, MCL 750.377b; MSA 28.609(2), and of breaking and entering of a building with intent to commit a felony, MCL 750.110; MSA 28.305. The trial court sentenced defendant as an habitual offender, fourth offense, MCL 769.12; MSA 28.1084, to concurrent terms of five to fifteen years for the escape conviction, five to fifteen years for the malicious destruction of police property conviction, and eight to twenty years for the breaking and entering conviction. Defendant appeals as of right. We vacate defendant's conviction of malicious destruction of police property but affirm his remaining convictions and sentences.

On March 25, 1996, corrections officers at the Mason County Jail discovered a broken window in

one of the cells. Glass was found outside the window. A closer inspection revealed the presence of fresh cut marks on the window bars. Across from the broken window, the fence surrounding the jail had been cut so that it opened like a door. Three inmates, including defendant and Jeff Stakenas, occupied the cell with the damaged window.

Stakenas testified that defendant had told him that his "boys" were coming to get him out. Defendant told Stakenas that he was going to break the window so that his friends could pass a hacksaw blade through, at which point he would try to saw through the bars. One night Stakenas heard noises that he believed to be someone cutting through the outside fence. Defendant told Stakenas to watch the door for guards. Defendant then took Stakenas' crutch and used it to break out the window. Stakenas saw a gloved hand come through the window and pick out pieces of glass. Although Stakenas did not see anyone pass defendant hacksaw blades, he observed defendant trying to cut through the bars.

Craig Allen Cook, Jr., an inmate at the Mason County Jail, said that around the second week in March, defendant approached him and asked if he wanted to leave jail. Defendant told him that the window in his cell was broken, the fence outside was cut open, and he had hacksaw blades with which to cut the bars. Three days later, Cook testified, defendant told him he was going to get a .22 caliber pistol so he could get keys from a guard and asked Cook again if he wanted to escape. Cook never actually saw a gun or a hacksaw in defendant's possession.

Another inmate, Doug LeClair, stated that in early March defendant said that he did not plan on serving his time. Later, defendant informed LeClair that someone had come to the jail, cut the fence, broken the window, and handed him a gun through the opening because he was going to break out. After LeClair spoke with a detective, he talked to defendant while wearing a concealed radio transmitter. LeClair testified that he told defendant that authorities had questioned him about the escape, and defendant said something like "I don't know what you're talking about."

After the jury began deliberating, defense counsel noted that earlier that day, after the prosecution had rested, he had received the following items from the police: (1) an audio tape; (2) two partial transcript pages of the conversation purported to be on the tape; and (3) approximately thirty pages of supplemental reports from the sheriff's department, including reports regarding inmate Michael Thompson. The prosecutor conceded that defense counsel had not been provided with these items, but stated that he, the prosecutor, had not been in possession of the materials and that, in any case, the materials were not exculpatory. Defense counsel conceded that there was "obviously a lot of damaging material in there from Defendant's standpoint," but argued that even if the information were not exculpatory, it might have led to exculpatory evidence, and furthermore the information might have affected whether defendant testified at trial. The trial court concluded that defendant had not been prejudiced and denied any relief. The jury subsequently found defendant guilty

of escape while awaiting trial for a felony, of malicious destruction of police property, and of breaking and entering of a building with intent to commit a felony.

At a posttrial hearing to expand the record, Cris VanOosterum, the prosecutor at defendant's trial, reiterated that he had not received copies of the materials until after they had been given to defense counsel. In addition, VanOosterum testified that he had been informed that Thompson wanted to make a statement in connection with the attempted escape and had directed the sheriff's department to take his statement. Later, VanOosterum was approached by Thompson's mother, who reported that Clay Fox had told her that he, his brother Brian, Tommy Green, and a fourth person had broken into the Mason County Jail yard on more than one occasion to help defendant escape. On another occasion, when her daughter was present, Clay Fox told Ms. Thompson that he and others were responsible for the attempt to break defendant out of jail. VanOosterum shared all this information with defense counsel. However, the morning of the trial, Ms. Thompson told VanOosterum that she could not remember anything and, if she were called as a witness, that would be the extent of her testimony. Accordingly, VanOosterum informed defense counsel that he would not be calling the Thompsons as witnesses.

Subsequently, defendant moved for a new trial. At the hearing concerning defendant's motion, Detective Jordan Hartley testified that Thompson had indicated that he had information regarding the cutting of the security fence at the jail. Thompson stated that he

had witnessed Brian Fox, Clay Fox, and an unknown female cutting the fence and passing things into the cellblock through a broken window. Hartley told Thompson that he would have to take a polygraph examination; Thompson initially agreed but later changed his mind. Subsequently, Thompson told Hartley that Tommy Green, rather than an unidentified female, had accompanied Brian and Clay Fox. In addition, Thompson denied being an eyewitness to the incident, saying that he had merely overheard conversations regarding the escape. Hartley stated that no agreements were made with Thompson in exchange for his testimony or cooperation.

Thompson testified that he became an inmate at the Mason County Jail in July of 1996. He contacted the police regarding the March escape attempt in hopes of obtaining a deal for himself. Both of the statements that he gave Hartley were untrue; he had not witnessed the incident and had not taken part in conversations about it until afterward. Thompson stated that the police encouraged him to lie and told him that he would have to say that he had been an eyewitness. Thompson acknowledged that the police had told him that he would have to take a lie detector test.

The trial court denied defendant's motion for a new trial. The court concluded that defendant's right to due process had not been violated by the belated delivery of the materials because defendant had not been prejudiced. The court reasoned that the use of Thompson's testimony would have been problematic because it was clear that he went into the interviews seeking a deal, and his claim that the police told him

what to say was "dramatically inconsistent" with their insistence that he take a polygraph test. The trial court also rejected defendant's claims regarding the sufficiency of the evidence in support of the conviction of malicious destruction of police property, double jeopardy violations, and juror misconduct.

I

Defendant first argues that he was denied due process because the prosecutor, in violation of a discovery request, withheld exculpatory information. A defendant has a due process right of access to certain information possessed by the prosecution. *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963). In order to establish a *Brady* violation, a defendant must prove (1) that the state possessed evidence favorable to the defendant, (2) that the defendant did not possess the evidence and could not have obtained it with the exercise of reasonable diligence, (3) that the prosecution suppressed the favorable evidence, and (4) that had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different. *People v Lester*, 232 Mich App 262, 281; ___ NW2d ___ (1998).

After carefully reviewing the record, we find no *Brady* violation. The alleged exculpatory information consists of interviews and notes by police investigators that would for the most part have been inadmissible hearsay if the defense tried to offer them. The documents contain very little, if any, admissible evidence that is even arguably exculpatory. In determining the materiality of undisclosed information, a

reviewing court may consider any adverse effect that the prosecutor's failure to respond might have had on the preparation or presentation of the defendant's case. *Id.* However, although defendant makes general observations concerning how the delayed disclosure of materials *can affect* defense strategy, he makes no specific claims regarding the *actual effect* of the late delivery of the materials on his defense. We note that defendant was able to recall at least one witness and question him regarding information contained in the materials. Moreover, defendant did not request a continuance because of his belated receipt of the materials.

Defendant contends that he was prejudiced by late disclosure of the materials because the prosecutor included Thompson, his mother, and his sister on the witness list he supplied to defense counsel during the week immediately preceding trial, but then abruptly dropped them from his list immediately before trial. Defendant contends that the prosecutor was "bluffing" and asserts that this tactic might have affected the defense strategy, including the decision whether defendant would testify, and led defense counsel to waste time preparing for testimony that the prosecutor had no intention of using. However, defendant fails to explain how this allegation of prosecutorial misconduct is related to the late delivery of the various items. Moreover, defendant points to no evidence that establishes that the prosecutor included the Thompsons on his witness list only for tactical reasons. The trial court found that the prosecutor decided not to use the Thompson witnesses because they had recanted their statements and because of

inconsistencies in their stories. The trial court found the prosecutor to be credible; we will not disturb this finding. See *People v Givans*, 227 Mich App 113, 123-124; 575 NW2d 84 (1997).

Defendant also argues that he was prejudiced by the late delivery of the materials because during the presentation of the prosecution's case he was unaware of Tommy Green's alleged threats to several inmates. We find no indication that evidence favorable to defendant was thereby suppressed. At the hearing concerning defendant's motion for a new trial, Thompson denied telling Hartley that he lied because he was afraid of Green. Defendant failed to call LeClair, Cook, and Stakenas at the hearing concerning his motion for a new trial to establish whether their testimony had been influenced by threats from Green.[1]

Defendant next contends that the transcript of the recording made of the conversation between LeClair and defendant was exculpatory because defendant denied involvement in the attempted jail escape. However, defendant elicited the substance of that exchange when LeClair testified as a defense witness.[2] Because the jury was informed that defendant

---

[1] Defendant also contends that Hartley testified falsely when he stated at trial that he interviewed only two inmates, Cook and LeClair. At the hearing concerning defendant's motion for a new trial, Hartley stated that he also interviewed Thompson and another inmate. Hartley explained that at trial he had answered the question in the context of what he had done on the initial day of the investigation; he had interviewed Thompson and the other inmate at a later time. While Hartley's description of his investigation was incomplete, we do not find that a new trial is required. Defendant has failed to demonstrate that Hartley's testimony resulted in the suppression of evidence favorable to him. See *Brady, supra*.

[2] The trial transcript contains the following passage from LeClair's testimony as a defense witness:

had disavowed knowledge of the attempted escape, we conclude that defendant was not prejudiced by the tardy delivery of the transcript.

Defendant also argues that the prosecution violated his Fifth Amendment right against self-incrimination by outfitting another prisoner with a concealed radio transmitter to have a conversation with defendant while defendant was in custody. However, the United States Supreme Court has held that *Miranda*[3] warnings were not required where a law enforcement officer posed as a fellow inmate of a suspect in order to obtain information because the situation did not involve the coercive atmosphere of questioning by a

---

*Q.* Did you have conversations with Mr. Fox while you were wearing the wire?

*A.* Yeah, I said something to him when we were going through the library on the way back to east cell.

*Q.* Did you testify this morning "no" when that question was asked of you?

*A.* Yes.

*Q.* I'll give you a chance; did you have conversations with him while you had the wire on?

*A.* I said something to him on the way through. Depends on what you call conversation. If we were sitting down talking, no, we weren't. When I come out of the, there was a room there where they put the wire on, and the library is right next to it. I come out, there was a bunch of people there going into the library at that time. And Jason was standing there. And I was standing there. And I said, "Jason, they're trying to"—or I said, " Jason, they called me in there and asked me questions about the Jail Escape or attempted Escape", whatever it is. And Jason heard me say that. He took off to the other side of the library. And from there I went to my cell.

*Q.* He didn't respond to your question?

*A.* Yeah, I think he said something. I'm not real positive on this. And I think he said something like, "I don't know what you're talking about" or whatever. But that was the extent of it. If that is a conversation, I mean that's the extent of it.

[3] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

known police officer. See *Illinois v Perkins*, 496 US 292; 110 S Ct 2394; 110 L Ed 2d 243 (1990). Similarly, we find no violation of the right against self-incrimination based on another prisoner's surreptitiously acting as a police agent while conversing with defendant.

## II

Defendant next contends that there was insufficient evidence to support his conviction of malicious destruction of police property. This conviction was predicated on the breaking of the window in the county jail. Defendant maintains that the window constituted "real property," while MCL 750.377b; MSA 28.609(2) refers only to "personal property."

MCL 750.377b; MSA 28.609(2) provides:

> Any person who shall wilfully and maliciously destroy or injure the *personal property* of any fire or police department, including the Michigan state police, shall be guilty of a felony. [Emphasis added.]

On appeal, we review de novo questions of law regarding statutory interpretation. *People v Sheets*, 223 Mich App 651, 655; 567 NW2d 478 (1997). Our goal in interpreting statutes is to ascertain the intent of the Legislature. The first criterion in determining the Legislature's intent is the specific language of the statute. If the plain and ordinary meaning of the language is clear, judicial construction is normally neither permitted nor necessary. *Id.* at 656. In interpreting statutes, words are to be given their common, generally accepted meaning. The court should presume that every word has some meaning and should avoid any construction that would render a statute, or

any part of it, surplusage or nugatory. *People v Nickerson*, 227 Mich App 434, 439; 575 NW2d 804 (1998).

In Black's Law Dictionary (6th ed), p 1217, "personal property" is defined as "everything that is the subject of ownership, not coming under denomination of real estate." "Real property" is defined as "[l]and, and generally whatever is erected or growing upon or affixed to land." *Id.* at 1218. A fixture is not personal property, but rather is part of real property. *Wayne Co v Britton Trust*, 454 Mich 608, 615; 563 NW2d 674 (1997). Property is a fixture if (1) it is annexed to the realty, whether the annexation is actual or constructive, (2) its adaptation or application to the realty being used is appropriate, and (3) there is an intention to make the property a permanent accession to the realty. *Id.* at 610. Under this definition, the window of a building clearly constitutes a fixture and thus is an item of real property, not personal property.

The trial court noted that there was "a legislative deficiency in language" but found that MCL 750.377b; MSA 28.609(2) proscribed the breaking of the window at issue. We conclude that the trial court erred in failing to apply the statute as written. MCL 750.377b; MSA 28.609(2) uses the term "personal property" and is therefore inapplicable to the destruction of real property such as the window of the county jail. To construe MCL 750.377b; MSA 28.609(2) as applying to real property would be to read the statute as if it simply stated "property," rather than "personal property." Such a construction violates the established rule of statutory interpretation providing that every word in a statute has meaning and no word should be rendered

nugatory. See *Nickerson, supra.* Accordingly, because the evidence presented at trial related to the destruction of real property, rather than personal property, we vacate defendant's conviction of malicious destruction of police property.[4]

We recognize that our decision leads to the anomalous result that the destruction of real property of a police or fire department is treated less seriously than the destruction of personal property.[5] However, this outcome is dictated by the plain language of the statute. If a change is to be made, it must be done by the Legislature and not by the courts.

III

Defendant next asserts that the use of prison escape as the predicate offense for breaking and entering with intent to commit a felony violated the prohibitions against double jeopardy in the United States and Michigan Constitutions, US Const, Am V; Const 1963, art 1, § 15.[6] A double jeopardy issue constitutes a question of law that is reviewed de novo on

---

[4] Defendant also argues his conviction of malicious destruction of police property was not supported by the evidence because the jail building, and thus the window, was owned by the county and not by any police or fire department. Because we have already determined that defendant's conviction must be vacated, we do not address whether the window at issue constituted the property of a police department.

[5] The conduct at issue would be subject to prosecution under MCL 750.380; MSA 28.612, which prohibits wilful and malicious destruction or injury to the building of another with the crime being a felony if the damage is over $100, a misdemeanor if the damage is $100 or less.

[6] Defendant also argues that his convictions of both malicious destruction of police property and breaking and entering violated the constitutional prohibition against double jeopardy. However, because we have already vacated defendant's conviction of malicious destruction of police property, resolution of this issue is unnecessary.

appeal. *People v Lugo*, 214 Mich App 699, 705; 542 NW2d 921 (1995).

One of the protections of the Double Jeopardy Clauses of the United States and Michigan Constitutions is to prohibit the state from imposing multiple punishments for the same offense. *North Carolina v Pearce*, 395 US 711, 717-719; 89 S Ct 2072; 23 L Ed 2d 656 (1969); *People v Sturgis*, 427 Mich 392, 399; 397 NW2d 783 (1986). The constitutional protection against multiple punishment for the same offense is a restriction on a court's ability to impose punishment in excess of that intended by the Legislature. Because the Legislature has the sole power to define crime and fix punishment, the Double Jeopardy Clause is not a limitation on the Legislature's power to establish punishment. *People v Price*, 214 Mich App 538, 541; 543 NW2d 49 (1995). Accordingly, even if the crimes are the same, a double jeopardy challenge based on multiple punishment will not succeed if it is evident that the Legislature intended to authorize cumulative punishments. In determining legislative intent, a court must identify the type of harm the Legislature was intending to prevent. Statutes prohibiting conduct that violates distinct societal norms generally can be viewed as separate and as permitting multiple punishments. *Id.*

We find no double jeopardy violation. The elements of breaking and entering an occupied dwelling with intent to commit a felony are as follows: (1) a breaking and entering; (2) of an occupied dwelling; and (3) with felonious intent. *People v Brownfield (After Remand)*, 216 Mich App 429, 431; 548 NW2d 248 (1996). In contrast, the jail escape statute requires a

showing that (1) the defendant was lawfully imprisoned in a jail or other place of confinement while
awaiting legal proceedings or transfer to prison and
(2) the defendant broke or attempted to break the jail
or place of confinement, regardless of whether an
escape was actually made. MCL 750.197(2);     MSA
28.394(2). Each statute protects against different societal norms. The breaking and entering statute applies
to all occupied buildings. In contrast, the jail escape
statute is specifically directed at maintaining the
security of jails, thereby protecting the public from
accused persons likely to be dangerous, as well as
ensuring that accused persons appear at legal proceedings and convicted persons remain confined.

Defendant argues that because the maximum punishment for breaking and entering is ten years, and
the maximum punishment for jail escape is four
years, the Legislature could not have intended multiple punishment for the two offenses. However,
although there is a difference in the length of possible
punishment, that fact is not dispositive where one
crime does not build on the elements of the other,
imposing a greater sentence for aggravating factors.
*People v Robideau*, 419 Mich 458, 487-488; 355 NW2d
592 (1984). There is no indication that the Legislature
intended the crime of prison escape to be subsumed
in the offense of breaking and entering. Accordingly,
we find that defendant's convictions of jail escape
and breaking and entering an occupied building with
the intent to commit a felony do not violate double
jeopardy.

IV

Defendant next argues that the trial court abused its discretion in denying defendant's motion for a new trial because of juror misconduct. Before this Court will order a new trial on the ground of juror misconduct, some showing must be made that the misconduct affirmatively prejudiced the defendant's right to a trial before a fair and impartial jury. *People v Fetterley,* 229 Mich App 511, 545; 583 NW2d 199 (1998).

Defendant asserts that he is entitled to a new trial because two jurors did not acknowledge that they were acquainted with each other and a third juror. The third juror did state that he knew two other people on the jury; however, defense counsel did not ask any additional questions.[7] All three jurors testified at the hearing concerning defendant's motion for a new trial. The three jurors all worked for the same employer; however, none of the three had supervisory control over either of the others. Although they were acquainted from work, they did not socialize together. Each juror testified that knowing the two other jurors affected neither his or her ability to remain impartial nor the partiality of the jury as a whole. The trial court noted that in a rural county it was likely that people would know each other and found that there was no evidence that defendant had been prejudiced. Because defendant has not demonstrated that the jurors' impartiality was impaired, we conclude that the trial court did not err in denying defendant's motion for a new trial.

---

[7] At the hearing concerning defendant's motion for a new trial, defense counsel testified that he did not hear the juror state that he knew two other jurors.

V

Finally, defendant argues that he is entitled to a new judge on remand. We have not found that remand is required. We briefly note, however, that even if remand were necessary, we would not find that disqualification of the trial judge is warranted. The record does not reflect a showing of actual bias or prejudice against defendant. See *People v Gomez*, 229 Mich App 329, 331; 581 NW2d 289 (1998). Contrary to defendant's argument, repeated rulings against a litigant do not require disqualification of a judge. See *People v Houston*, 179 Mich App 753, 759; 446 NW2d 543 (1989).

Defendant's conviction of malicious destruction of police property is vacated. Defendant's remaining convictions and sentences are affirmed.