# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

TARANADA CARSON, JR.,

        Defendant-Appellant.

UNPUBLISHED
October 13, 2016

No. 326410
Wayne Circuit Court
LC No. 14-005836-01-FC

---

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

DIAGO MARCUS JONES,

        Defendant-Appellant.

No. 326760
Wayne Circuit Court
LC No. 14-005836-02-FC

---

Before: FORT HOOD, P.J., and GLEICHER and O'BRIEN, JJ.

PER CURIAM.

Defendants Taranda Carson and Diago Jones, along with codefendant Mary Pye, jointly stood trial for the beating death of Louis Norris and the robbery of Norris's home. Separate juries convicted Carson of second-degree murder and second-degree home invasion and Jones of felony murder, torture, and second-degree home invasion. Pye was acquitted. In these consolidated appeals, defendants raise several challenges to their convictions, none of which have merit. Although we affirm the convictions, we must vacate Carson's sentences and remand for consideration under *United States v Crosby*, 397 F3d 103 (CA 2, 2005).

## I. BACKGROUND

Late in the evening of June 23, 2014, Dominque Reynolds asked her neighbor, Norris, to watch her 11-year-old son, DR, while she visited a friend around the block. At approximately 10 or 11 p.m., Reynolds's sister, Alecia Latimer, arrived at Reynolds's home with a carload of friends, including Pye, Kyle Wilson, Carson, and Jones. Latimer went into the home and spoke

-1-

with DR. Based on this conversation Latimer believed that Norris had sexually assaulted her nephew. Latimer flew into a rage and Norris retreated to his next door home.

According to Wilson, Latimer acted as the ring leader and encouraged Jones to join her in kicking Norris while Norris sat on his front porch. Reynolds returned home shortly after Latimer's arrival, resulting in a brief pause in the action. Reynolds described that Jones and Carson then attacked Norris, jumping on him and hitting him with fists, a metal folding chair, and a 2½-foot rod. Reynolds accused Pye of spraying Norris in the face with an aerosol substance. Jones admitted to police that he struck Norris once, but shifted blame for the attack to Latimer and Carson.

Following the assault, the group decided to burgle Norris's home. At trial, Wilson described that Latimer and young DR entered Norris's house and carried various items to Reynolds's home for storage. Wilson earlier told police that Carson, Jones, and DR were involved in the burglary. Reynolds identified Carson, Jones, and Pye as the thieves.

Police discovered Norris's body on his front porch the following morning. Norris's head was covered in blood and first responders believed he had been shot. Norris's home was also ransacked. Later examination revealed that Norris had actually been killed by multiple blunt blows to his head, one or more of which fractured Norris's spine.

Investigators initially interrogated Latimer and Reynolds and learned the names of the others present on the night in question. After hearing of Latimer's part in the attack and robbery from defendants and Wilson, officers attempted to arrest her as well, but she successfully evaded capture.

Ultimately, Carson, Jones, and Pye were tried jointly but before separate juries. As noted, the juries convicted Carson and Jones of several charged offenses, and they now appeal.

## II. DISPUTED ACCOMPLICE INSTRUCTION

Carson asserts that the trial court improperly denied his request for a disputed accomplice instruction. Specifically, Carson contends that Wilson implicated Reynolds in the home invasion by testifying that Latimer and DR carried stolen items into Reynolds's home and Reynolds implicated herself in Norris's murder by admitting her presence during part of the attack. This evidence rendered suspect Reynolds's trial testimony minimizing her role and that of her sister, Carson urges. We review the trial court's decision for an abuse of discretion. *People v Young*, 472 Mich 130, 135, 140-141; 693 NW2d 801 (2005).

M Crim JI 5.5 (formerly CJI2d 5.5) provides:

(1) Before you may consider what [*name witness*] said in court, you must decide whether [he/she] took part in the crime the defendant is charged with committing. [*Name witness*] has not admitted taking part in the crime, but there is evidence that could lead you to think that [he/she] did.

(2) A person who knowingly and willingly helps or cooperates with someone else in committing a crime is called an accomplice.

-2-

(3) When you think about [*name witness*]'s testimony, first decide if [he/she] was an accomplice. If, after thinking about all the evidence, you decide that [he/she] did not take part in this crime, judge [his/her] testimony as you judge that of any other witness. But, if you decide that [*name witness*] was an accomplice, then you must consider [his/her] testimony in the following way:

The use notes direct the court to then read M Crim JI 5.6 regarding the weighing of accomplice testimony.

A court may only give a jury instruction regarding accomplice testimony if supported by the evidence, *People v Ho*, 231 Mich App 178, 189; 585 NW2d 357 (1998), and the instruction was not warranted here. As defined in the instruction, an "accomplice" must "knowingly and willingly help[] or cooperate[]" in the commission of the crime. There simply was no evidence that Reynolds played a part in the crimes. Wilson indicated that when Reynolds arrived on the scene, she attempted to speak to Norris. She did not assault him or encourage anyone else to do so. Reynolds told a similar story. Rather, the evidence supports that Reynolds attempted to act as a peacemaker.

Wilson's testimony also does not substantiate that Reynolds was an accomplice in the home invasion. Wilson accused Latimer and DR of bringing stolen items into Reynolds's house. Latimer slept at Reynolds's that night. This fact falls far short of demonstrating Reynolds' complicity in the theft. On this record, we discern no abuse of discretion in the trial court's rejection of Carson's jury instruction request.

### III. AUTOPSY PHOTOS

Jones challenges the admission of several photographs from Norris's autopsy over his objection. In a supplemental brief, Carson challenges his trial counsel's failure to more aggressively fight for exclusion of all the photos. We note at the outset that Carson's counsel argued passionately against admission of the photos and his efforts cannot be faulted. Accordingly, we focus solely on the admissibility of the challenged evidence.

We review a trial court's decision to admit photographic evidence for an abuse of discretion. *People v Cervi*, 270 Mich App 603, 625; 717 NW2d 356 (2006). The photos were not inadmissible merely because they vividly depicted Norris's injuries. "Photographs are admissible if substantially necessary or instructive to show material facts or conditions." *People v Hoffman*, 205 Mich App 1, 18; 518 NW2d 817 (1994); see also MRE 401. Although MRE 403 provides that evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, "[i]f photographs are otherwise admissible for a proper purpose, they are not rendered inadmissible merely because they vividly portray the details of a gruesome or shocking accident or crime, even though they may tend to arouse the passion or prejudice of the jurors." *Hoffman*, 205 Mich App at 18. Autopsy photos are considered relevant when they are "instructive in depicting the nature and extent of the victim's injuries." *People v Flowers*, 222 Mich App 732, 736; 565 NW2d 12 (1997). Whether relevant photographic evidence should be excluded depends on whether its probative value is substantially outweighed by the danger of unfair prejudice under MRE 403. *People v Mills*, 450 Mich 61, 76; 537 NW2d 909 (1995), mod 450 Mich 1212 (1995).

The challenged autopsy photos were relevant because they depicted the nature and extent of Norris's injuries, confirming that they had been inflicted with fists, feet, and a metal rod. They also promoted the jury's understanding of the medical examiner's explanation of why the first responders believed that Norris had been shot rather than beaten. And displaying the extreme nature of Norris's injuries was helpful in establishing the malicious intent of his attackers.

The few photos that were actually admitted at trial were also not unduly duplicative of the witness descriptions of Norris's condition. "Photographs are not excludable simply because a witness can orally testify about the information contained in the photographs"; they may be admitted "to corroborate a witness's testimony." *Id.* Moreover, the observations of the first responders did not correlate Norris's injuries with his cause of death, or the actual medical nature of the injuries. The photos created a bridge between the testimony of those first responders and the medical examiner and were probative in explaining the disconnect.

Furthermore, photos depicting the nature and extent of Norris's injuries evinced defendants' intent. Intent was a principal issue in this case because the prosecution charged defendants under different murder theories—first-degree felony, first-degree premeditated, and second-degree. Viewing photos of the injuries inflicted was beneficial for the juries to select the level of culpability of each defendant.

The trial court sought to avoid any potential for unfair prejudice by excluding numerous other autopsy and crime scene photos that it believed were more graphic and gruesome and that would be cumulative of the admitted photos. Moreover, our review of the three photos actually admitted at trial reveals that they are not particularly lurid or vivid as asserted by Jones. One photo shows Norris's face. A large oval wound appears on his cheek, another between his eyelid and eyebrow. A puncture-type wound sits between his eyes. One eye is bruised and swollen. A second full-body picture shows that Norris's wounds were limited to the head area. The third photo shows a gash on the back of Norris's head. All blood was cleaned from Norris in the pictures. The photos are clinical rather than prejudicially inflammatory. Accordingly, the trial court acted within its discretion in admitting them and additional efforts on the part of Carson's counsel would have been futile.

## IV. SUFFICIENCY OF THE EVIDENCE: JONES

Jones contends that the prosecution presented insufficient evidence to support his convictions for felony murder, torture, and home invasion.[1] We review such challenges de novo, considering "the evidence in the light most favorable to the prosecution" to determine whether a rational trier of fact could have found all elements of the charged crime proven beyond a reasonable doubt. *People v Schaw*, 288 Mich App 231, 233; 791 NW2d 743 (2010). Circumstantial evidence and any reasonable inferences arising from the evidence may be sufficient to prove the elements of a crime. *People v Hardiman*, 466 Mich 417, 429; 646 NW2d

---

[1] Jones also challenges his second-degree murder conviction, but the trial court vacated that conviction to avoid Double Jeopardy concerns.

158 (2002). "This Court will not interfere with the trier of fact's role of determining the weight of the evidence or the credibility of witnesses. All conflicts in the evidence must be resolved in favor of the prosecution." *People v Williams*, 268 Mich App 416, 419; 707 NW2d 624 (2005).

> To establish a felony-murder charge, the prosecution must prove:
>
> (1) the killing of a person, (2) with the intent to kill, do great bodily harm, or create a high risk of death or great bodily harm with the knowledge that death or great bodily harm was the probable result, (3) while committing, attempting to commit, or assisting in the commission of an enumerated felony. [*People v Lane*, 308 Mich App 38, 57-58; 862 NW2d 446 (2014).]

The prosecution argued that Jones was guilty as either a direct participant or an aider and abettor. Aiding and abetting felony murder requires proof that the defendant

> (1) performed acts or gave encouragement that assisted the commission of the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result, (3) while committing, attempting to commit, or assisting in the commission of the predicate felony.
>
> In order to satisfy the malice standard . . ., the prosecution must show that the aider and abettor either intended to kill, intended to cause great bodily harm, or wantonly and willfully disregarded the likelihood that the natural tendency of his behavior was to cause death or great bodily harm. Further, if an aider and abettor participates in a crime with knowledge of the principal's intent to kill or to cause great bodily harm, the aider and abettor is acting with "wanton and willful disregard" sufficient to support a finding of malice. [*People v Riley (After Remand)*, 468 Mich 135, 140-141; 659 NW2d 611 (2003) (citations omitted).]

Jones's principal argument is that because he played a minimal role in the assault, insufficient evidence supported that he acted with the necessary malice. In this regard, Jones relies on his police statement in which he limited his involvement to hitting and kicking Norris once. However, other evidence supports that Jones played a larger role and the jury obviously credited those accounts. Wilson testified that after Latimer hit and kicked Norris repeatedly, Jones jumped in and hit Norris once in the upper body. Reynolds testified that after she arrived on the scene, two men (determined to be Jones and Carson by elimination) "snatched" Norris from his house and began hitting him with their fists. One of the men struck Norris with a metal chair and the other with a 2½-foot rod. Reynolds unsuccessfully attempted to pull Jones and Carson off of Norris. According to Reynolds, the men took breaks in their assault of Norris to drink liquor. This evidence, viewed in a light most favorable to the prosecution, sufficed to prove that Jones bore the intent to kill, do great bodily harm, or at least create a high risk of death or great bodily harm.

Jones also argues that the evidence was insufficient to prove that Norris was killed during the commission of another felony. The jury convicted Jones of felony murder based on the

underlying felony of torture. The offense of torture is proscribed by MCL 750.85, which provides:

> (1) A person who, with the intent to cause cruel or extreme physical or mental pain and suffering, inflicts great bodily injury or severe mental pain or suffering upon another person within his or her custody or physical control commits torture . . . .
>
> (2) As used in this section:
>
> (a) "Cruel" means brutal, inhuman, sadistic, or that which torments.
>
> (b) "Custody or physical control" means the forcible restriction of a person's movements or forcible confinement of the person so as to interfere with that person's liberty, without that person's consent or without lawful authority.
>
> (c) "Great bodily injury" means either of the following:
>
> (*i*) Serious impairment of a body function . . . .
>
> (*ii*) One or more of the following conditions: internal injury, poisoning, serious burns or scalding, severe cuts, or multiple puncture wounds.
>
> (d) "Severe mental pain or suffering" means a mental injury that results in a substantial alteration of mental functioning that is manifested in a visibly demonstrable manner caused by or resulting from any of the following:
>
> (*i*) The intentional infliction or threatened infliction of great bodily injury.
>
> * * *
>
> (*iii*) The threat of imminent death. . . .

First, evidence supports that Jones controlled Norris by "snatching" him from his house and beating him so forcibly that Norris could not escape. Second, Reynolds's testimony described a prolonged assault, during which Jones and Carson repeatedly hit and kicked Norris, called him a "rapist" and "pervert," cussed at him, and struck him with a metal folding chair and a 2½-foot rod. From this, the jury could infer that Jones intended to cause cruel or extreme physical or mental pain and suffering. Lastly, the evidence establishes that Jones actually inflicted great bodily injury on Norris. Norris suffered multiple blunt force traumas, including a fatal neck injury. Accordingly, sufficient evidence supported the predicate felony for Jones's murder conviction, as well as his separate conviction for torture.

The evidence also sufficed to establish Jones's commission of second-degree home invasion.

> Second-degree home invasion requires proof that the defendant entered a dwelling by breaking or entering without the permission of any person in ownership or

-6-

lawful possession or control of the dwelling and did so with the intent to commit a felony, larceny, or assault therein or committed a felony, larceny, or assault while entering, present in, or exiting the dwelling. [*People v Dunigan*, 299 Mich App 579, 582; 831 NW2d 243 (2013).]

See also MCL 750.110a(3). Although Wilson denied at trial that Jones and Carson entered Norris's house, the prosecution impeached this testimony with Wilson's police statement, in which he stated that both men entered the home and removed property. Moreover, Reynolds testified that both men entered Norris's house and removed items, including a vacuum and a microwave. In his police statement, Jones admitted that he went into Norris's house and used his phone as a flashlight. Viewed in a light most favorable to the prosecution, the evidence was sufficient to enable the jury to find beyond a reasonable doubt that Jones entered Norris's house without permission, with the intent to commit larceny, and that he committed a larceny while inside.

## V. INEFFECTIVE ASSISTANCE OF COUNSEL

Carson argues that his trial counsel was ineffective for (1) failing to adequately prepare to impeach Reynolds, (2) failing to call an expert witness to testify regarding the time of Norris's death, and (3) advising Carson not to testify at trial. Carson failed to raise these claims in the trial court and this Court denied his motion to remand. *People v Carson*, unpublished order of the Court of Appeals, entered June 21, 2016 (Docket No. 326410). We discern no reason to remand and limit our review to mistakes apparent on the existing record. *People v Horn*, 279 Mich App 31, 38; 755 NW2d 212 (2008).

US Const, Am VI and Const 1963, art 1, § 20 protect a defendant's right to the assistance of counsel. "[T]he right to counsel is the right to effective assistance of counsel." *United States v Cronic*, 466 US 648, 653; 104 S Ct 2039; 80 L Ed 2d 657 (1984). Effective assistance is presumed and a defendant bears a heavy burden of proving otherwise. *People v Vaughn*, 491 Mich 642, 670; 821 NW2d 288 (2012). To prevail on an ineffective assistance claim, a defendant must establish that (1) his defense counsel's performance was objectively deficient and (2) the deficient performance prejudiced his defense. *Strickland v Washington*, 466 US 668, 687; 104 S Ct 2052; 80 L Ed 2d 674 (1984); *People v Pickens*, 446 Mich 298, 302-303; 521 NW2d 797 (1994). However,

"a court cannot insulate the review of counsel's performance by calling it trial strategy"; counsel's strategy must be sound, and the decisions as to it objectively reasonable. Courts must determine whether the "strategic choices [were] made after less than complete investigation," or if a "reasonable decision [made] particular investigations unnecessary." [*People v Ackley*, 497 Mich 381, 388-389; 870 NW2d 858 (2015) (citations omitted).]

Carson argues that defense counsel was ineffective for failing to prepare to adequately impeach Reynolds. In his remand motion, Carson described that his "family presented to [counsel] evidence to prove [Reynolds's] dishonesty" but counsel declined to review it. Carson did not present this Court with the subject evidence or summarize its content and thereby failed

to establish the factual predicate of his claim. See *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999). Accordingly, we have no basis on which to grant relief.

Carson contends that counsel should have secured an independent expert to testify regarding the time of Norris's death. At trial, the medical examiner conceded that he could not determine the time of Norris's death, partly because Norris's body was located outside and it had rained that night. The defense made use of this uncertainty to argue reasonable doubt. On appeal, Carson has not presented an affidavit or other offer of proof to show that any expert could have provided favorable testimony in this regard. Again, the failure to support his argument is fatal.

Carson further complains that counsel ineffectively advised him against taking the stand. An on-the-record exchange at trial and a note submitted by Carson on appeal both demonstrate that defense counsel accurately informed Carson that he had an absolute right to testify. In the note, counsel warned, "I do not think it [testifying] is advisable." Carson has not supported that his allegedly ill-advised decision not to testify prejudiced his defense, however. Presumably, Carson would have denied or limited his involvement in the offenses. Jones's jury gave little weight to Jones's denials and we have no ground to find that Carson's jury would have reacted more favorably. As such, relief is unwarranted.

## VI. SUFFICIENCY AND GREAT WEIGHT OF THE EVIDENCE: CARSON

Carson challenges the evidentiary support for his second-degree murder conviction. He asserts that the prosecution presented insufficient evidence to support his conviction and that his conviction is against the great weight of the evidence. Carson requested a remand on the great weight issue, which this Court denied. Our review of that issue is therefore limited to plain error affecting Carson's substantial rights. *People v Musser*, 259 Mich App 215, 218; 673 NW2d 800 (2003).

Carson's sole contention on appeal is that an intervening factor must have caused Norris's death. Carson emphasizes that Norris's body was found outside on a summer morning. He posits that had Norris been killed around 11:00 p.m., the environmental conditions "would normally hasten insect infestation." Yet, Carson asserts, Norris's body "was still in the early stages of postmortem." Carson further notes that witnesses described Norris as alive and sitting up on his porch after the assault.

At trial, the medical examiner, Dr. Kilak Kesha, testified that the one most direct cause of Norris's death was a fracture to the spinal column in his neck. The injury "would inhibit or stop respiration . . . within a minute and death within several minutes." Given the nature of this injury, Norris could not have sat up on his porch for long after the final blow of the assault. The jury was left to determine whether Carson and his compatriots broke Norris's neck and lied about his condition upon their exodus or whether someone came along afterward and inflicted the fatal injury. The jury discredited the story of those involved in and present during the assault that Norris was alive and alert when they left him. We may not interfere with that assessment.

It is true that Dr. Kesha "could not determine the time of death." Kesha testified that the night's rain would have quickened the onset of rigor mortis, and "[r]igor had set in" here. The

examiner denied that outside temperatures have an effect on the speed with which insects "start showing activity on the body." Insects arrive "[a]s soon as the body dies and stops moving." In this case, Kesha noted "the beginning of this insect infestation" on Norris's body, including "fly eggs in the ear of the decedent." Although Kesha admitted "that nature gets to work pretty quickly," he never claimed that nine hours was too long a resting period. The jury could therefore find that nine to 10 hours since the time of death was a reasonable time line. Importantly, Dr. Kesha never described Norris's condition as "the early stages of postmortem," as stated by Carson.

Neither did the evidence technician on whose testimony Carson heavily relies. Police Officer Angela Anderson-Cobb testified "there was quite a bit of insect activity in the wounds." She described in further detail:

> [I]t just indicates that blow flies, which are attracted to cadavers, will start laying maggots within a few hours of somebody, eating up the decedent having passed, depending on weather conditions. It depends on a lot of different things. But it was like - - just fly eggs were deposited in those areas.

Cobb's testimony was that flies had already laid eggs on the body. This was consistent with Norris being dead for "a few hours." Her testimony, overall, was consistent with Dr. Kesha's. And both supported that Norris could have died nine to 10 hours earlier.

Moreover, the mechanism of Norris's death was consistent with the character of the assault the witnesses described. Dr. Kesha concluded that Norris died from blunt force trauma and that all of his injuries occurred at or around the time of his death. None of the injuries were post-mortem. Dr. Kesha found Norris's injuries consistent with being struck by a cylindrical metal object (such as a rod), a chair, or a human fist, or by kicking, supporting the witnesses' description of the weapons used. Overall, a rational jury could have determined from this evidence that Norris died shortly after the assault and that the assault caused his death. We discern no ground to upset the jury's verdict.

## VII. FAILURE TO PRESERVE EVIDENCE

At trial, Cobb testified that she photographed a white washcloth in Norris's bathroom that appeared to have blood on it. The photo was presented into evidence. However, the washcloth was not collected as evidence. Cobb admitted that as a result, she had no way to know whose blood was on the cloth. Carson now argues that the failure to collect, preserve, and test this evidence violated his constitutional right to due process or to present a defense. Because this issue was not raised in the trial court, it is unpreserved and our review is limited to plain error affecting Carson's substantial rights. *People v Carines*, 460 Mich 750, 762-763; 597 NW2d 130 (1999).

Criminal defendants have a fundamental constitutional right to present a defense. *People v Anstey*, 476 Mich 436, 460; 719 NW2d 579 (2006). To protect this right, US Const, Am XIV requires that the prosecution not suppress material evidence that is favorable to the defense. *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963); *People v Fox (After Remand)*, 232 Mich App 541, 549; 591 NW2d 384 (1998). Due process requires that the

prosecution disclose exculpatory and material evidence in its possession, regardless of whether the defendant requests it. *People v Schumacher*, 276 Mich App 165, 176; 740 NW2d 534 (2007). However, "[f]or due process purposes, there is a crucial distinction between failing to disclose evidence that has been developed and failing to develop evidence in the first instance." *Antsey*, 476 Mich at 461. "[T]he police have no constitutional duty to assist a defendant in developing potentially exculpatory evidence." *Id.* As such, the failure to collect and test evidence does not violate a defendant's right to present a defense. *Id.* at 461-462. Here, the police had no duty to collect the washcloth and place it into evidence, let alone to conduct DNA testing. Accordingly, the failure to do so did not violate Carson's right to present a defense.

In any event, Carson's theory that the washcloth would support his intervening cause theory is based solely on speculation, unsupported by any evidence. On the contrary, the evidence suggested that the bloody washcloth was used by Norris during the respite in the attack following Reynolds's arrival. According to witnesses, when Carson, Jones, Pye, and Latimer first went to Norris's home, Carson struck him with a metal chair. That metal chair had blood on it which matched Norris's. When Reynolds came to Norris's house, she found him inside his bathroom. Reynolds observed a bump on Norris's head at that time. And a trail of blood spots went through the house between the porch and the bathroom. The most logical inference is that the blow from the chair caused Norris to bleed and he used the washcloth while he was in the bathroom to staunch the flow or clean the blood.

## VIII. SENTENCING ISSUES

Carson raises a two-pronged attack on his sentences, contesting the evidentiary support for the scoring of a prior record variable (PRV) and the constitutionality of basing his scores on judicially found facts. As noted by this Court in *People v Biddles*, ___Mich App ___; ___NW2d ___ (Docket No. 326240, issued June 30, 2016), slip op at 4, each of these "challenges has its own distinct remedy." When a court "clearly err[s] in finding that a preponderance of the evidence supported one or more of the [variables] or otherwise erred in applying the facts to the [variables], *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013), and if the scoring error resulted in an alteration of the minimum sentence range, he would be entitled to resentencing, *People v Francisco*, 474 Mich 82, 89; 711 NW2d 44 (2006)." *Biddles*, slip op at 4. A constitutional challenge under *People v Lockridge*, 498 Mich 358; 870 NW2d 502 (2015), however, does not demand remand for resentencing. Rather, under *United States v Crosby*, 397 F3d 103 (CA 2, 2005), on remand the defendant has the choice whether to pursue resentencing. *Biddles*, slip op at 4-5. If the defendant does not make this decision in a timely fashion, the court must decide whether resentencing is necessary as proscribed in *Crosby*. *Biddles*, slip op at 5. As an evidentiary error demands resentencing and a constitutional error only a possibility of resentencing, this Court must consider evidentiary challenges first. If an evidentiary error demands resentencing, the constitutional error is rendered moot. *Id.*

Under the first prong of his challenge, Carson contends that he is entitled to resentencing because the trial court erroneously assessed 20 points for prior record variable (PRV) 7. MCL 777.57(1)(a) provides for a score of 20 points when "[t]he offender has 2 or more subsequent or concurrent convictions." The court must score this variable when a defendant is "convicted of multiple felony counts." MCL 777.57(2)(a). Originally, the jury convicted defendant of two counts of second-degree murder and one count of home invasion. Recognizing the impropriety

of entering two murder convictions for a single killing, the court vacated one. Thereafter, Carson had only one conviction entered concurrently with each sentencing offense. Accordingly, the court should have assigned only 10 points for PRV 7. The 10-point reduction reduces Carson's total PRV score from 32 to 22 points and his PRV Level from D to C. This in turn lowers the minimum sentencing guidelines ranges for Carson's second-degree murder and home invasion convictions. Remand for resentencing is therefore required under *Hardy* and *Francisco*. On remand, the trial court must resentence Carson consistent with the principles outlined in *Lockridge*, i.e., keeping in mind that the sentencing guidelines are advisory only. *Biddle*, slip op at 5. Given this result, we need not consider Carson's additional challenges based on judicial factfinding.

We affirm defendant Carson's convictions in Docket No. 326410, but vacate his sentences and remand for resentencing. We do not retain jurisdiction. We affirm defendant Jones's convictions in Docket No. 326760.

/s/ Karen M. Fort Hood
/s/ Elizabeth L. Gleicher
/s/ Colleen A. O'Brien

-11-