# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

JOHN ANDREW HOWELL,

Defendant-Appellant.

UNPUBLISHED
July 13, 2017

No. 323671
Chippewa Circuit Court
LC No. 13-001230-FC

Before: SERVITTO, P.J., and MURRAY and BORRELLO, JJ.

PER CURIAM.

Defendant appeals as of right from his jury trial convictions of indecent exposure, MCL 750.335a, and first-degree criminal sexual conduct (CSC-1), MCL 750.520b. He was acquitted of accosting a minor for immoral purposes. Defendant was sentenced to serve concurrent prison terms of 365 days for indecent exposure and 70 months to 50 years for CSC-1. For the reasons set forth in this opinion, we affirm defendant's convictions and sentences.

## I. BACKGROUND

Defendant was accused of having sexual relations with complainant and attempting to have sexual relations with another adolescent, BH, a charge for which he was acquitted, while he was a middle school teacher at the school complainant and BH attended. Defendant was also accused of indecent exposure for having pulled down his pants in front of adolescents HC, MV and ML one New Year's Eve. There was testimony indicating that complainant, HC, MV and BH would spend time at defendant's home, as they were all friends with ML, the daughter of the woman with whom defendant had a relationship. (Hereinafter referred to as "the mother"). According to testimony at trial, defendant would provide the girls with alcohol and marijuana. Testimony also revealed that defendant drank alcohol and smoked marijuana with the girls on at least one occasion, and had four of the adolescents in his car on one occasion when he purchased and sold marijuana.

BH testified that on one occasion defendant inappropriately asked her if she "would suck his dick." She further stated that she drank alcohol that he provided, that she had seen him intoxicated and involved with marijuana, and that she had smoked marijuana in his car. She testified that on another occasion he drew "I want you" on her shoulder, and that on yet another occasion he "was really drunk and he took all his clothes off" in front of her and ML.

-1-

Complainant testified that defendant acted "[i]n a more sexual way" with her compared to how he treated the other girls. She testified she had an addiction to marijuana, that defendant gave her money to buy marijuana, and that she had purchased marijuana for him before. Complainant testified that on a date she could not recall, defendant had been drinking alcohol and kissed her on the lips, and that she and defendant had sex that night. She testified that prior to sex, defendant had given her alcohol and he then awakened her after she had gone to sleep in the living room with ML and MV, saying that he wanted to talk about "how cool I am and how he liked me." She testified that they went to the bedroom, that defendant and another man in the bedroom named "Key" asked her "to strip" and then all three did so, and that she was then bent over the bed and defendant "stuck his penis" in her vagina while Key put his penis in her mouth. She testified, "I let it go on for a few more minutes and then I told them to stop—that I wanted to go outside." Complainant did not tell anyone about the incident right away and stated that when it happened she "didn't care" because "I didn't have enough respect for myself."

Complainant met with Detective Tom Swanson on February 22, 2013 and told him that nothing inappropriate happened involving defendant and another male. However, Detective Darrell Harp interviewed complainant in June 2013 and she told him that she had sexual intercourse with defendant. While testifying, Harp referred to complainant's late reporting as "delayed disclosure," explaining that he had been trained regarding victims involved in sexual assaults "[a]nd the sensitivity of the acts themselves," and stated that "[i]t's hard for them to come out with that. The late reporting is common and I've experienced that with prior complaints." Harp testified that complainant presented as a case of "delayed exposure [sic]", consistent with what Harp had seen before.

At trial, defendant denied engaging in any inappropriate conduct with complainant and BH, and also denied that he had provided alcohol or marijuana for the girls. He explained that on New Year's Eve, he was drunk and "mooned" his girlfriend, directing the "mooning" at her specifically because she had made a funny or joking comment. He denied that the "mooning" was directed at the girls. Defendant admitted that "some of the kids" had seen him in an intoxicated state and that it was inappropriate. He denied taking any minor girls to hang out with him in his car.

Following his convictions, defendant filed a motion for a new trial asserting that there was newly discovered eyewitness testimony from ML that demonstrated defendant did not have sex with the complainant and that complainant was not raped. Defendant attached the affidavits of two minor girls and defense trial counsel, Daniel Hartman. Hartman averred that at trial he was provided a witness list by the prosecutor that included the two minors and that he attempted to contact and interview both girls but was informed that they were in foster care or no longer residing with their parents. Hartman averred that he obtained ML's mother's contact information and spoke with her but she did not provide ML's contact information or arrange for Hartman to speak with ML.

According to her affidavit, ML would have testified that (1) in January 2013 defendant, ML's mother, ML and a few friends went to a Bubba Sparxx concert; and that (2) defendant came home without ML's mother and went straight to bed; that (3) "[n]othing was going on in [defendant's] bedroom", that (4) complainant was with ML in the living room "sleeping right next to me", that (5) "[t]here [was] no possible way that anyone was having sex in either of the

bedrooms; I would have heard it", and that (6) "[t]here [was] no possible way that complainant got up from where she was sleeping right next to me and went anywhere in the house because her movement would have awakened me." ML averred that during the time she and her mother lived with defendant, her mother shared defendant's bedroom every night except for the night of the concert. ML further averred that when she asked complainant "whether [defendant] really raped her", complainant told her "[n]o." After hearing arguments, the trial court denied the motion for a new trial.

Defendant filed a second motion for a new trial asserting that the prosecution improperly withheld information, including information that the complainant had multiple juvenile petitions brought against her for delinquency, as well as notes or police reports showing that ML had told the prosecutor that defendant and complainant did not have sex. The motion also asserted that trial counsel was ineffective because he failed to interview witnesses, failed to call witnesses who would have provided exculpatory evidence, and failed to object to the "delayed disclosure" "expert" testimony or call an expert witness to debunk the "expert" testimony. Defendant attached the affidavit of Katherine Keefer Okla, a clinical psychologist who averred, among other assertions, that complainant's "initial denial of abuse when asked, followed by a subsequent disclosure or changing account with new details is inconsistent with the empirical research data about patterns of disclosure of abuse in suspected and confirmed victims of abuse."

The trial court denied defendant's motion finding, in relevant part, that complainant's truancy record was "menial" and the jury was already aware she had substance abuse problems. The trial court also noted that ML's averment that complainant was not raped was consistent with complainant's own testimony, which was that the sex was consensual. The trial court further noted that ML was always available to Hartman to be interviewed or testify but the trial court believed Hartman did not have ML testify because "her story was all over the place." The trial court stated that "[t]he case really came down to Mr. Howell's version to [complainant's] version and the jurors elected to believe [complainant]."

As part of defendant's second motion for a new trial, he requested, and was granted, a *Ginther*[1] hearing. At the *Ginther* hearing, Hartman testified that he never received anything related to complainant's juvenile record from the prosecution and was unaware until recently that she had a history that predated the charges. When asked what effort Hartman had made to interview ML and her mother, Hartman testified that he had been in contact with the mother. Hartman testified that he assumed the prosecution would call ML as a witness and that "I relied upon my ability to think on my feet and cross-examine her and did not seek a court order to have her produced from foster care and interviewed by me." The trial court noted that both were present on the morning of the last day and that the mother was present the entire afternoon of the preceding day. Hartman testified that he should not have interviewed ML on the last day of trial for the first time but he had presumed that he would have "some time over the lunch hour to investigate, discuss the strategy and try to figure out what the use of those witnesses would be."

---

[1] *People v Ginther*, 390 Mich 436, 443-444; 212 NW2d 922 (1973).

Hartman stated: "You have to remember in the heat of the case and the trial preparation and the all events leading up to it, it was my belief at that point that things were going well. Therefore, I mistakenly gambled with [defendant's] life and just decided to proceed forward instead of stopping and preparing for those witnesses that weren't called." Hartman testified ML contacted him after the trial "and said she wished she could've testified and she revealed to me that [complainant] had told her that [defendant] didn't rape her or something along those lines." Hartman also testified that he recalled trial testimony about delayed disclosure of sexual abuse and that he did not object to it because he believed the testimony to be true, although he now believed that the testimony was "junk science" and "a social myth."

At the conclusion of the *Ginther* hearing the trial court denied defendant's motion for a new trial. The trial court found that Hartman did not deficiently perform under the *Strickland*[2] standard because there was no showing that but for Hartman's errors, the proceedings would have been different. The trial court noted that Hartman hired an investigator to take pictures and interview witnesses and that any pictures that should have been introduced "would [only] have been added to what everybody already knew" about the layout of defendant's home because "[e]very girl that was there testified to that" and so did defendant. The trial court stated that Hartman did not call the mother to testify because Hartman believed the mother was "at odds" with defendant because defendant had married the mother's sister and Hartman was nervous that the mother's testimony would be "all over the map." The trial court stated that nothing suggested that testimony from ML or her mother "would've been incredible." The trial court noted that ML testified that complainant told her that complainant was not raped but this information was not inconsistent with complainant's own testimony that the sex was initially consensual. Likewise, the trial court noted that ML testified to a specific night that the sex occurred but this was not inconsistent with complainant's testimony because complainant testified that she could not remember what night the sex act occurred. The trial court stated that the jury believed complainant over defendant and again denied the motion for a new trial.

## II. ANALYSIS

### A. DELAYED DISCLOSURE TESTIMONY

On appeal defendant raises a number of errors which he claims individually and collectively entitle him to a new trial. He begins his appeal by arguing that it was error to allow Harp's reference to "delayed disclosure." Defendant also argues that counsel's failure to object constituted ineffective assistance of counsel.

Defendant asserts, and we agree that because defendant did not object to the complained of testimony, the issue is unpreserved and our review is limited to determining whether plain error affected defendant's substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). "To avoid forfeiture under the plain error rule, three requirements must be met: 1)

---

[2] *Strickland v Washington*, 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674, reh den 467 US 1267 (1984).

error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights. *Id.* at 763. "Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error " 'seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings' independent of the defendant's innocence." *Id.* at 763-764 (citations omitted).

Defendant preserved the ineffective assistance of counsel claim by filing a motion for a new trial on this basis. *People v Wilson*, 242 Mich App 350, 352; 619 NW2d 413 (2000). Whether counsel has performed ineffectively is a mixed question of law and fact. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). "A judge must first find the facts, and then must decide whether those facts constitute a violation of the defendant's constitutional right to effective assistance of counsel." *Id.* The trial court's findings of fact are reviewed for clear error and the questions of law are reviewed de novo. *Id.*

Defendant argues that Harp's testimony was improper lay and expert opinion testimony under MRE 701 and 702, and that he improperly vouched for complainant's credibility.

Opinion testimony by lay witnesses is permissible when that testimony is "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based in scientific, technical, or other specialized knowledge within the scope of Rule 702." MRE 701. An "expert" is "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education." MRE 702. Expert testimony by a witness is permissible when:

> (a) the expert's scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case. [MRE 702.]

This Court has found that a police officer may provide lay testimony regarding his observations in a criminal matter and his "opinion formed as a result of those observations." *People v Oliver*, 170 Mich App 38, 50; 427 NW2d 898 (1988), modified and remanded on other grounds 433 Mich 862 (1989). However, the court rule restricts this to matters that do not involve specialized knowledge. MRE 701(c). Detective Harp was never qualified as an expert witness and thus, if his testimony constituted an opinion involving specialized knowledge, a proper foundation was not laid.

In this case, the prosecutor asked Harp if he was familiar with the term "delayed disclosure." Harp testified that part of his training as a police officer included the fact that victims of sexual assaults have a hard time coming out with what happened to them given the sensitivity of the acts and consequently delayed reporting is common and that he had experienced delayed reporting in prior cases. Harp then testified that he believed this was a delayed reporting case, indicating that complainant's delayed reporting was consistent with the

notion of delayed disclosure, which he indicated meant that it was hard for sexual assault victims to disclose the assaults. While this does involve an opinion that arguably is based on specialized knowledge and training, and an objection might have resulted in the comment about sexual assault victims' difficulty in disclosing being struck from the record, the thrust of his testimony was that complainant's report was consistent with the delayed disclosures he had previously encountered. While this line of questioning may have constituted error, our review for unpreserved claims is for "plain" error. Whether commenting on "delayed disclosure" requires expert testimony constitutes a close question, thus not one where we can find "clear error." Even if we presume error, we cannot find from the record that error: "…resulted in the conviction of an actually innocent defendant or 'seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings' independent of the defendant's innocence." *Carines*, 460 Mich at 763-764.[3] While we presume the introduction of the testimony to have been error, we are not able to classify the testimony as "plain error" as we concur, to some extent, with plaintiff's argument that the testimony could be construed as more an observation or lay opinion based on experience than an expert opinion based on specialized knowledge. Accordingly, while it may have been plain error for the trial court to have allowed this testimony, we cannot find within the record that such testimony resulted in plain error affecting a substantial right.

We employ the same analysis when deciding defendant's claim that "delayed disclosure" is an impermissible attempt by the State to bolster the credibility of the claimant. Defendant argues there are no other reasons for this line of discussion other than to make the jury believe that "delayed disclosure" is some scientific theory which essentially comports to operate as a human lie detector. Plaintiff counters that nothing in Harp's testimony was intended or actually bolstered the credibility of the victim. Rather, plaintiff argues, Harp was merely testifying about his observations, and his opinions formed by those observations. *Oliver*, 170 Mich App at 50. Again, we note this presents a close legal question, hence we cannot find the complained of testimony operated as improper vouching therefore leading us to conclude there exists in the record "plain error." Even if we were to presume error, we cannot find that such error "…resulted in the conviction of an actually innocent defendant or 'seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings' independent of the defendant's innocence." *Carines,* 460 Mich at 763-764.

In regard to defendant's ineffective assistance of counsel claim, "[t]o prevail on a claim of ineffective assistance, a defendant must, at a minimum, show that (1) counsel's performance was below an objective standard of reasonableness and (2) a reasonable probability that the outcome of the proceeding would have been different but for trial counsel's errors." *People v Ackerman*, 257 Mich App 434, 455; 669 NW2d 818 (2003), citing *People v Kevorkian*, 248 Mich App 373, 411; 639 NW2d 291 (2001). During the *Ginther* hearing, trial counsel stated that

---

[3] Given that the alleged error we are asked to review is unpreserved, we expressly leave open the issues of whether evidence or testimony relating to "delayed reporting" must be offered by a duly qualified expert under MRE 702 or that an assertion by a governmental witness of "delayed reporting" constitutes impermissible vouching for the credibility of the victim.

since the trial he had come to view "delayed disclosure" as "junk science." Even if this was a recent opinion for counsel, certainly there was every indicium that the evidence being offered was, at the very least, objectionable. Hence, similar to the trial court's analytical framework, we presume trial counsel was ineffective in failing to object and turn to the second prong of *Strickland* to determine whether defendant suffered prejudice such that there exists a reasonable probability that the outcome of the proceeding would have been different but for trial counsel's failure to object to Harp's testimony regarding "delayed disclosure." See *Ackerman*, 257 Mich App at 455.

In this matter, claimant gave a credible reason for her delay in reporting. In addition, multiple young girls testified about defendant's sexual remarks, advances, sexual behavior towards claimant, and his grooming with marijuana and alcohol. The trial court noted when twice denying defendant's motion for a new trial that the case came down to whose testimony was believed by the jury. Claimant testified that she and defendant engaged in sex. Defendant denied engaging in any sex act with defendant and also denied the allegations set forth by other witnesses. A reasonable jury could choose to believe defendant and the other witnesses, which, as the trial court noted, is precisely what happened. Review of the record in its entirety leads us to find it doubtful that Harp's brief reference to the notion of "delayed disclosure" would have resulted in a different outcome at trial. Accordingly, defendant cannot demonstrate the he was prejudiced by trial counsel's failure to object and defendant is not entitled to relief on this issue.

## B. *BRADY* VIOLATION

Defendant next argues that the prosecution violated the rule of *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963) by failing to disclose various pieces of evidence and that defense counsel was ineffective for failing to investigate exculpatory evidence and impeachment evidence relative to claimant.

"A defendant has a due process right of access to certain information possessed by the prosecution." *People v Fox (After Remand)*, 232 Mich App 541, 549; 591 NW2d 384 (1998), citing *Brady*, 373 US at 83. A *Brady* violation occurs if: "(1) the prosecution has suppressed evidence; (2) that is favorable to the accused; and (3) that is material." *People v Chenault*, 495 Mich 142, 150; 845 NW2d 731 (2014). "The government is held responsible for evidence within its control, even evidence unknown to the prosecution, without regard to the prosecution's good or bad faith . . . Evidence is favorable to the defense when it is either exculpatory or impeaching." *Id.* at 150 (citation and quotation marks omitted). "To establish materiality, a defendant must show that there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* (citation and quotation marks omitted).

Defendant first argues that the prosecution failed to turn over exculpatory evidence that would have been provided by ML. At trial, defendant testified that the only night he was not in the house with his girlfriend when girls were there was a night following a concert, and that claimant was not there that night. With his first motion for new trial, defendant provided an affidavit from ML in which she averred that in January 2013 defendant, his girlfriend, ML, and a few friends went to a Bubba Sparxx concert, that defendant and his girlfriend dropped the friends off at the house after the concert and then went out somewhere, and that defendant came home

alone and went straight to bed. ML averred that "[n]othing was going on in [defendant's] bedroom", that claimant was with ML in the living room "sleeping right next to me", that "[t]here [was] no possible way that anyone was having sex in either of the bedrooms; I would have heard it", and that "[t]here [was] no possible way that [claimant] got up from where she was sleeping right next to me and went anywhere in the house because her movement would have awakened me." ML averred that during the time she and her mother lived with defendant, her mother shared defendant's bedroom every night except for the night of the concert. She further averred that when she asked claimant "whether [defendant] really raped her", [claimant] told her "[n]o." ML further averred that defendant's attorneys wanted to talk to her but that her father and step-mother would not allow it. She noted that she was subpoenaed and was in the hallway when defendant's attorney asked to talk to her and her step-mother told him no. ML averred, "The attorney and my mother went into a room to talk and I thought it over and then just got up and went into the room with them." ML averred, "I only had a few minutes to talk to the attorney before he had to go back into the court room for something. I told him some things, but I did not have time to tell him everything or to explain all about why I knew the charges were not true." ML averred that she had wanted to testify.

Defendant also argued that certain pictures would have added credibility to ML's testimony, that her testimony related to the only possible night that claimant could have had sex with defendant and provided evidence that the two did not have sex, that ML's testimony would indicate that claimant had denied that she was raped by defendant, and that this newly discovered evidence was "extremely important." Defense counsel also argued that trial counsel had met the "due diligence prong of newly discovered evidence" because he had tried, through an investigator, to interview ML but was unable to do so because she was in a placement.

The trial court determined that the pictures violated the discovery rules so a new trial based on the pictures was denied. The trial court noted that trial counsel never requested an adjournment, a stay, a recess, or an extension for access to ML or her mother, and that he spoke to them in the hallway and had a "brief exchange" where they "discussed several aspects of the case." The trial court concluded that trial counsel had access to ML and always had access to her mother, and that claimant had never testified that she had been raped but only that she had had sex with defendant. Accordingly, the trial court denied the motion for a new trial.

As to defendant's contention of a *Brady* violation we note that the record does not support the first *Brady* requirement by showing that there was suppression. Defendant's assertion that the prosecution withheld ML's exculpatory information from defense counsel is unsupported. There was no showing that the prosecutor or the police were aware that ML would testify that claimant was not present on a night she would identify as the one where the alleged assault would have occurred or that claimant had denied that a rape took place. Moreover, ML herself was not suppressed. She was identified on the prosecutor's witness list, and defense counsel was provided contact information for ML's mother and made successful contact with her. Moreover, counsel was able to have a "brief exchange" with ML during which they discussed "several aspects of the case." It was a tactical decision by trial counsel not to call ML to testify. In a case where trial counsel was provided the name of the witness, a contact number for the witness and spoke directly to the witness, we fail to glean even an *argument* for a *Brady* violation.

Defendant next argues that the prosecution failed to turn over impeaching evidence related to claimant's juvenile record. The record includes some documentation of delinquency proceedings involving claimant that indicated 2011 probation violations and truancy from school in 2010, 2011, 2012, and 2013, and that claimant was placed in "the Sault Tribe Youth Facility" in 2011, had completed a "Juvenile Justice Diversion & Reintegration Alternatives" program in 2012, and was placed in the "Vassar Home Passages Program" in 2013. Defendant asserts that without this information, defense counsel was denied the opportunity to explore potential ulterior motives for claimant to be cooperative with the prosecution, and to rebut the prosecution's theory that claimant had no motivation to lie.

Relative to the issue of claimant's alleged past criminal behavior, the fact that claimant may have had charges that had been adjudicated or were pending would not have been admissible at trial under MRE 609(e) which states:

> Juvenile adjudications. Evidence of juvenile adjudications is generally not admissible under this rule, except in subsequent cases against the same child in the juvenile division of a probate court. The court may, however, in a criminal case or a juvenile proceeding against the child allow evidence of a juvenile adjudication of a witness other than the accused if conviction of the offense would be admissible to attack the credibility of an adult and the court is satisfied that admission is necessary for a fair determination of the case or proceeding.

One of the initial requirements for demonstrating a *Brady* violation is that the proffered evidence was admissible at trial; otherwise it would not constitute evidence. Such was the decision in *Wood v Bartholomew*, 516 US 1, 6, 13; 116 S Ct 7; 133 L Ed2d 1 (1995) wherein the Supreme Court held that failure to produce polygraph results that were inadmissible under state law could not form the basis of a *Brady* violation because they were inadmissible and as such did not constitute evidence. Here, MRE 609(e) made claimant's prior criminal past inadmissible. While defendant argues that claimant's record is evidence that she had incentive to help the prosecution in hopes of getting help with her juvenile proceedings, this alone is insufficient to establish a *Brady* violation because materiality requires a showing that there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. See, *Kyles v Whitley*, 514 US 419, 433-434; 131 L Ed2d 490; 115 S Ct 1555 (1995); *United States v Bagley*, 473 US 667, 682; 87 L Ed2d 481; 105 S Ct 3375 (1985) holding that the failure to disclose evidence justifies setting aside a conviction, only where there exists a "reasonable probability" that had the evidence been disclosed the result at trial would have been different. See also, *Chenault*, 495 Mich at 150. Defendant cannot demonstrate that the result of the proceeding would have been different by forcing the State to produce inadmissible documents. *Kyles*, 514 US at 433-434. Accordingly, defendant is not entitled to relief on this issue.

Defendant also argues that trial counsel was ineffective for failing to investigate this exculpatory and impeaching evidence. "Effective assistance of counsel is presumed, and a defendant bears a heavy burden to prove otherwise." *People v Swain*, 288 Mich App 609, 643; 794 NW2d 92 (2010). "As our Supreme Court has recognized, the materiality prong of the *Brady* test requires the same showing of prejudice required to establish ineffective assistance of counsel." *People v Stokes*, 312 Mich App 181, 192; 877 NW2d 752 (2015). Because defendant

cannot demonstrate that any material evidence was withheld, he cannot demonstrate that any failure by his attorney to seek this evidence earlier warrants relief. *Id.*

## C. PROSECUTORIAL ERROR

Defendant next argues that the prosecutor's closing argument violated his due process rights. Defendant failed to preserve this issue by objecting to the prosecutor's remarks. See *People v Leshaj*, 249 Mich App 417, 419; 641 NW2d 872 (2002).

> "We review prosecutorial misconduct in context to determine whether the defendant was denied a fair and impartial trial. *People v Watson*, 245 Mich App 572, 586; 629 NW2d 411 (2001). Absent an objection at trial to the alleged misconduct, appellate review is foreclosed unless a defendant demonstrates plain error that affected his substantial rights, i.e., error that was outcome determinative. *Id.*; *People v Schutte*, 240 Mich App 713, 720; 613 NW2d 370 (2000). Reversal is warranted only when the error resulted in the conviction of an actually innocent defendant or when the error seriously affected the fairness, integrity, or public reputation of judicial proceedings. *Id.* No error requiring reversal will be found if the prejudicial effect of the prosecutor's comments could have been cured by a timely instruction. *Id.* at 721, 613 NW2d 370." [*Leshaj*, 249 Mich App at 419.]

In closing argument, the prosecutor stated that defendant was a predator whose crimes were premeditated and that he took advantage of claimant and tried to take advantage of other girls. The prosecutor told the jury that it was their job to determine the credibility of witnesses and then provided the jury with "some things I want you to consider." The prosecutor stated that claimant's story was "completely different" from defendant's and asked the jury to use its common sense to determine who was lying. The prosecutor presented the elements of the crimes and explained that it was required to prove the charges beyond a reasonable doubt. To conclude his argument, the prosecutor stated:

> Finally, there are really few citizens in our society that have fewer rights than children. And we have a constitution that requires justice for all even though children are not yet adults and they don't have adult rights. They still are entitled to justice. If really justice is not for everyone it's for no one. But they have a right to be believed. They have a right not to be hurt. And they have a right to, to be able to say what's happened to them and have people try to understand and try to hear what it is there [sic] saying.
>
> And one of the things that [is] clear in this case, particularly with [claimant], is that she was trying to say what happened to her, how it made her feel. And she was looking for you. She was telling she was ashamed. And though you can't make her not ashamed, you can make sure that she had a chance for justice in this, in this courtroom, in this room.
>
> We tell kids its' [sic] okay for you to tell. It took [claimant] a long time to do that but we say it's okay to tell. You come to the adults when somebody,

-10-

somebody does something wrong. What parent hasn't said to their child, if somebody touches you in the wrong place, tell me. Tell your mom. Tell your dad, or grandma or grandpa. We tell kids that all the time because we want them to tell so we can help them. And we tell them when they do this we will help them. We will believe them.

But it's only okay to tell if we admit to ourselves the terrible crimes that happen. And children are used to satisfy the sexual desires of adults. And it's okay to believe a child. If we don't believe their nightmare, their nightmare just keeps on happening and then what happens to our justice. We don't tell our children, don't come to us; don't tell us because we won't believe you because you're just children.

One of the reasons that vulnerable children, children with whose dads have died, their mothers are very sick with cancer. Or mothers who can't, are by themselves, are victimized and sought out as good victims is because if these kids have some background, who's gonna believe them. If this kid goes to placement, or this kids already in trouble, who's going to believe them.

And the predators count on that. They've already in their mind discounted the value of those children because of who they are. And they're counting that other adults would think in that same sick, wrong way. That's not what we're doing. Submitted to you that you have a chance to believe these children about the important parts of their testimony and that's what happened to them and what they saw. You have a chance to say to them we will listen to you and we will hear what you're saying and we will hear what you're feeling and we will do what's right here.

What's right here is to confirm that the Defendant . . . , a teacher in this community for over twenty years. A man given, given respect in a position of responsibility and access to children. A man who comes here and denies that he did anything wrong is really something different. And what he is, is a child sexual predator. Please find him guilty of all the charges, thank you.

Defense counsel then argued that there was reasonable doubt. The prosecution offered a rebuttal argument, asserting that corroborating testimony was not necessary and that the jury was permitted to believe or not believe a witness or any part of the witness's testimony based on the jury's common sense understanding, what the witness looked like when testifying, if the witness's testimony was corroborated, and if the testimony made sense "in your common human judgment." The prosecutor concluded by stating:

So, simple, who do you believe? Comes down to that. Not DNA or concert nights. Corroboration. [Defendant] got up and denied everything. Produced not one witness to back up anything that he said. [claimant] is right. [BH] is right. Thank you very much and I appreciate your time and attention.

-11-

The trial court instructed the jury to return a verdict based only on the evidence and the trial judge's instructions on the law. It instructed the jury to "not let sympathy or prejudice influence your decision", that the prosecutor was required to prove each element beyond a reasonable doubt, and that defendant was not required to prove his innocence or do anything.

Defendant first argues that the prosecutor's statements about children appealed to sympathy and a sense of civic duty beyond the scope of the jury's duty to decide the facts of the case before them. Prosecutors "may not advocate that jurors convict a defendant as part of their civic duty." *People v Ackerman*, 257 Mich App 434, 452; 669 NW2d 818 (2003). However, "allegations of prosecutorial misconduct must be examined and evaluated in context." *Id.* We cannot concur with defendant's description of the prosecutor's arguments. The prosecutor was making a larger point about predators and children. These arguments were not intended to play on the emotions of the jury but rather were intended as arguments that defendant was a predator whose crimes were premeditated and that he took advantage of claimant and tried to take advantage of other girls. While the prosecutor made several statements about children at the end of his closing argument, he did so in the context of making a broader point about the jury's job to determine the credibility of witnesses, arguing that the jury had the opportunity to believe the children that had testified rather than defendant. Taken in context, the prosecutor's closing argument did not improperly advocate that the jurors convict defendant as part of their civic duty. Moreover, this Court has recognized that emotional language in a prosecutor's closing argument is ' "an important weapon in counsel's forensic arsenal.' " *People v Ullah*, 216 Mich App 669, 678-679; 550 NW2d 568 (1996), quoting *People v Mischley*, 164 Mich App 478, 483; 417 NW2d 537 (1987). The prosecutor's remarks fell within the boundaries regarding the proper use of emotional language and did not deny defendant a fair trial or meet the threshold for reversal based on unpreserved error.

Defendant next argues that the prosecutor's closing argument improperly vouched for the complainants' credibility. Specifically, defendant argues that improper vouching occurred when the prosecutor stated in rebuttal: "[Claimant] is right. [BH] is right."

"[A] prosecutor may not vouch for the credibility of his witnesses by implying that he has some special knowledge of their truthfulness." *People v Bahoda*, 448 Mich 261, 276; 531 NW2d 659 (1995). However, "a prosecutor may comment on his own witnesses' credibility during closing argument, especially when there is conflicting evidence and a question of the defendant's guilt depends on which witnesses the jury believes." *People v Thomas*, 260 Mich App 450, 455; 678 NW2d 631 (2004), citing *People v Flanagan*, 129 Mich App 786, 796; 342 NW2d 609 (1983). Here the prosecutor was merely arguing that his witnesses were telling the truth. He offered no evidence that he had any special insight into their credibility. In fact, he went on to point out that it was the province of the jury to ultimately determine who was telling the truth. On this record, we fail to glean any evidence of prosecutorial error relative to improper vouching. Accordingly, defendant is not entitled to relief on this issue.

Defendant next argues that the prosecutor improperly shifted the burden of proof to defendant when, during his rebuttal argument, he stated that defendant "[p]roduced not one witness to back up anything that he said." "In order to preserve an issue of prosecutorial misconduct, a defendant must contemporaneously object and request a curative instruction." *People v Bennett*, 290 Mich App 465, 475; 802 NW2d 627 (2010). Here, defendant did not do

so. Thus, his claims of prosecutorial misconduct are unpreserved, and we review them for plain error that affects defendant's substantial rights. *People v Thomas*, 260 Mich App 450, 453; 678 NW2d 631 (2004). Claims "of prosecutorial misconduct are considered on a case-by-case basis, and the reviewing court must consider the prosecutor's remarks in context." *Bennett*, 290 Mich App at 476.

Addressing defendant's burden shifting argument, "shifting the burden of proof or persuasion on an element of the crime charged violates due process." *People v Fields*, 450 Mich 94, 113; 538 NW2d 356 (1995). However, "attacking the credibility of a theory advanced by a defendant does not shift the burden of proof." *People v McGhee*, 268 Mich App 600, 635; 709 NW2d 595 (2005). Further, where a defendant "takes the stand and testifies in his own defense, his credibility may be impeached and his testimony assailed like that of any other witness . . . ." *Fields*, 450 Mich at 110 (quotation marks and citation omitted). Here, reading the prosecutor's statement in context, the prosecutor was merely commenting on the weaknesses in defendant's case and arguing that the evidence supported complainant and BH's versions of events. Therefore, the prosecution did not improperly shift the burden of proof. *Id.* at 110-112. See also *McGhee*, 268 Mich App at 635. Moreover, the jury was instructed that defendant was presumed innocent until proven guilty beyond a reasonable doubt and that the lawyer's arguments were not evidence, and "[j]urors are presumed to follow the instructions of the court." *People v Meissner*, 294 Mich App 438, 457; 812 NW2d 37 (2011). Thus, even if there was an error, reversal would not be required. *Id.* See also *Bennett*, 290 Mich App at 476.

Defendant lastly argues that he was denied the effective assistance of counsel by counsel's failure to object to the alleged prosecutorial misconduct. However, as discussed above, the unpreserved allegations of prosecutorial misconduct were not prejudicial to defendant. "[C]ounsel does not render ineffective assistance by failing to raise futile objections." *Ackerman*, 257 Mich App at 455, citing *People v Hawkins*, 245 Mich App 439, 457; 628 NW2d 105 (2001).

Affirmed.

/s/ Deborah A. Servitto
/s/ Christopher M. Murray
/s/ Stephen L. Borrello