*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

JOSHUA MALACHI PACE,

      Defendant-Appellant.

UNPUBLISHED
January 28, 2021

No. 350079
Wayne Circuit Court
LC No. 17-011011-01-FC

Before: JANSEN, P.J., and SERVITTO and RIORDAN, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions of carjacking, MCL 750.529a; and unlawful driving away of a motor vehicle, MCL 750.413. The trial court sentenced defendant to concurrent prison terms of 16 to 30 years for the carjacking conviction and three to five years for the unlawful driving away of a motor vehicle conviction. We affirm.

## I. FACTS AND PROCEDURAL BACKGROUND

In early November 2017, Amara Altairi and Aman Alrayyashi drove to a party in Dearborn in Altairi's Cadillac Escalade. Altairi had to park on a side street because of limited parking. After parking and as Altairi exited her vehicle, a red vehicle pulled up and parked next to the driver's side of Altairi's Escalade. Defendant exited the driver's side of the vehicle and another man, Timothy Murry, exited the passenger's side. Murry had a firearm, but defendant did not.

Defendant told Altairi on several occasions he needed money. Because she did not have any money, Altairi gave her gold ring to defendant. Defendant told Altairi to get back in her vehicle and follow him, and instructed Murry to ride in Altairi's vehicle. Defendant told Altairi, "If you try to go anywhere else, this man will kill you."

Altairi re-entered the driver's seat of the Escalade and Alrayyashi got into the front passenger's seat. Murry sat in between the two women in the middle row of seats and continued holding his gun. Defendant reiterated that Altairi was to follow him, went back to his vehicle, and pulled it in front of the Escalade. Altairi started her vehicle, but she and Alrayyashi exited the

-1-

Escalade and ran to the house where the party was being held. Murry then got into the driver's seat of the Escalade and drove away.

The police were called and went to the house where Altairi and Alrayyashi were and the two women provided statements to the police. However, because Altairi and Alrayyashi could not read or write in English, Altairi's friend, Ammani Elgahmi, wrote out Altairi's statement, while Alrayyashi's daughter, Maryam Alrayyashi, wrote out Alrayyashi's statement.

Shortly after the carjacking, witness Genaro Damien-Silva was driving on the Southfield Freeway, trying to exit onto the Ford Road exit ramp. His exit was blocked, however, by an Escalade and red vehicle that were stopped on the exit ramp. According to Damien-Silva, some men exited the Escalade and argued. Eventually, the Escalade drove away, but one of the men from the Escalade remained, approached Damien-Silva, and stated he had been robbed and was out of gas. The individual then jogged away from the scene. Sometime later, witness Thaddeus Broom was in his apartment at the Heather Apartment complex when he heard someone yell for help. The Heather Apartments was located only a short distance from where Altairi and Alrayyashi were accosted. Broom saw defendant outside his apartment, let him inside, and, after defendant claimed to have been robbed, Broom called the police.

Dearborn Police Sergeant Sergio Popescu responded to a call regarding a crash involving a carjacked Escalade. After receiving a description of the subjects involved in the carjacking and while still on the scene of the crash, Popescu received a call concerning an individual at the Heather Apartments claiming to have been robbed. Popescu arrived at the Heather Apartments and, noting that the person who claimed to have been robbed, defendant, matched the description of one of the carjacking suspects, handcuffed defendant and read him his *Miranda*[1] rights. Popescu wore a body camera that recorded audio and video of his encounter with defendant. Defendant claimed he picked up Murry in an attempt to obtain gas money in exchange for a ride, but was instead held at gun point and forced to participate in the carjacking of Altairi and Alrayyashi. Defendant asserted that when Murry got out of defendant's vehicle to take the Escalade, defendant drove away, but Murry gave chase and eventually struck defendant's vehicle off the highway. At that point, defendant ran to the Heather Apartments. Defendant was ultimately arrested and thereafter charged with and convicted of carjacking and unlawful driving away of a motor vehicle.

## II. PRIOR INCONSISTENT STATEMENTS

On appeal, defendant contends that Altairi's written statement contradicted her trial testimony that defendant threatened her life and that she gave defendant her ring. Defendant argues that the trial court erred when it prevented defense counsel from impeaching Altairi with her written statement, thereby depriving him of his right to confront the witnesses against him. We disagree.

This Court reviews constitutional questions, including whether a criminal defendant was denied his right to confront the witnesses against him, de novo. *People v Pipes*, 475 Mich 267, 274; 715 NW2d 290 (2006). "If a case involves nonstructural, preserved constitutional error, an

---

[1] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

appellate court should reverse unless the prosecution can show that the error was harmless beyond a reasonable doubt." *People v Plumaj*, 284 Mich App 645, 650; 773 NW2d 763 (2009) (citation omitted); see also *Delaware v Van Arsdall*, 475 US 673, 682-684; 106 S Ct 1431; 89 L Ed 2d 674 (1986) (holding that harmless-error analysis generally applies to Confrontation Clause errors). Harmless error review requires reversal only if the error was prejudicial." *People v Smith*, 456 Mich 543, 555; 581 NW2d 654 (1998) (citation omitted). "The inquiry into prejudice 'focuses on the nature of the error and assesses its effect in light of the weight and strength of the untainted evidence.' " *Id*. (citation omitted).

A trial court's decision to admit or exclude evidence is reviewed by this Court for an abuse of discretion. *People v Edwards*, 328 Mich App 29, 34; 935 NW2d 419 (2019). A trial court abuses its discretion when it selects an outcome that falls outside the range of reasonable and principled outcomes. *People v Yost*, 278 Mich App 341, 353; 749 NW2d 753 (2008). If, however, the inquiry into admissibility of evidence "requires examination of the meaning of the Michigan Rules of Evidence, a question of law is presented, which we review de novo." *People Ackerman*, 257 Mich App 434, 442; 669 NW2d 818 (2003).

Altairi testified at trial that defendant told her he needed money, that she gave her gold ring to defendant, and that defendant told her that if she did not follow him in her car, Murry would kill them. In response to a question from defense counsel regarding whether she told the police "everything that was important about this case," Altairi stated, "Yes." Defense counsel, however, noted that in her written statement, Altairi "never mentioned anything about anyone saying, they're gonna [sic] kill you, or the word kill" and asked, "You never say that, at all, isn't that true?" Altairi stated: "Yes, I told that to the Police, and I also told that in the court." When asked if she included defendant's threats against her life in her written statement, Altairi stated, "Yes, I did" and reiterated that she also told the police. When asked if she wanted to look at her statement to confirm its contents, Altairi stated, "No, I can't read or write. Otherwise, I wouldn't need an interpreter." Altairi testified that when the police arrived at the house, they asked her questions and her friend verbally translated them into Arabic for her, when necessary. According to Altairi, she then verbally provided answers to her friend, who wrote them down for her in English. Altairi indicated that she signed the written statement, but could not read its contents.

Altairi's written statement that was provided to police said:

> I was driving to a relative's house for a party at 4531 Helen. As I was parking on the corner, me and my friend get [sic] out of the car. As we're standing on the driver's side of the car, a small, old burgundy sedan parked on the ~~passenger's~~ driver's side. Two African-American men, one holding a silver gun at his side, asked us for "cash." I said I didn't have [any], so I gave him a gold ring instead. The one without the gun told us to get back in the car. ~~My f~~ The one with the gun grabbed my friend ~~and told~~ and pushed her to the backseat. My friend refused and told him that she'll sit in the front with me. We both got back in the car, me in the driver's seat, and my friend in the passenger seat. I tried to give him my car keys when I was giving him my ring, but he refused to take it and told me to get in the car and drive. The one with the gun got in the backseat and pointed the gun between us. The other guy was outside my window telling me to drive and

follow them. Once the guy got back in his car, me and my friend starting [sic] secreaming [sic] and ran out of the car and headed to 4531 Helen.

The prosecutor objected to counsel's reading of the above written statement signed by Altairi as hearsay. Hearsay is "a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c). Hearsay is generally inadmissible except as provided by the rules of evidence. MRE 802. The trial court sustained the prosecution's objection on the basis of hearsay and hearsay-within-hearsay.

Defendant, however, asserted before the trial court and now on appeal that the use of Altairi's written statement was for impeachment of her with a prior inconsistent statement and was not hearsay. Generally, a witness who denies memory of a prior inconsistent statement may be impeached with extrinsic evidence of that statement. *People v Shaw*, 315 Mich App 668, 683; 892 NW2d 15 (2016). Under MRE 607, "[t]he credibility of a witness may be attacked by any party, including the party calling the witness." And under MRE 613(b), "[e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require." In *Barnett v Hidalgo*, 478 Mich 151, 165; 732 NW2d 472 (2007), our Supreme Court explained the process to admit evidence under MRE 613(b):

> Before attempting to impeach a witness by offering extrinsic evidence of a prior inconsistent statement, a litigant must lay a proper foundation in accordance with the court rule. To do so, the proponent of the evidence must elicit testimony inconsistent with the prior statement, ask the witness to admit or deny making the first statement, then ask the witness to admit or deny making the later, inconsistent statement, allow the witness to explain the inconsistency, and allow the opposite party to cross-examine the witness. However, "extrinsic evidence may not be used to impeach a witness on a collateral matter . . . even if the extrinsic evidence constitutes a prior inconsistent statement of the witness, otherwise admissible under MRE 613(b)." [Citations omitted; omission in original.]

"The purpose of extrinsic impeachment evidence is to prove that a witness made a prior inconsistent statement—not to prove the contents of the statement." *People v Jenkins*, 450 Mich 249, 256; 537 NW2d 828 (1995).

We first note that although defendant asserted Altairi's written statement showed that she offered her ring and keys to Murry, not defendant as she testified, that assertion is not supported by a reading of her statement. The written statement provides that two "African-American men, one holding a silver gun at his side, asked us for 'cash.' " That is, the two men asked Altairi for money. Altairi's written statement then says, "I said I didn't have [any], so I gave *him* a gold ring instead." The statement further provides, "I tried to give *him* my car keys when I was giving *him* my ring, but *he* refused to take it and told me to get in the car and drive." Although the language of the written statement does not specifically identify which individual, defendant or Murry, Altairi was referring to, other information in the statement coupled with her testimony, demonstrates she was in fact referring to defendant as the individual who took her ring.

-4-

Altairi's written statement noted that "[t]he one with the gun got in the backseat and pointed the gun between" Altairi and Alrayyashi, while "[t]he other guy was outside my window telling me to drive and follow them." As noted above, the individual Altairi gave her ring to and refused to take the keys and told Altairi "get in the car and drive," demonstrating the person outside the vehicle, without the gun, was the one who took her ring. And, again, Altairi testified at trial she tried to give her ring and car keys to defendant. Alrayyashi also identified defendant as the person without the gun who took Altairi's ring. Thus, the content of Altairi's written statement, coupled with the testimony, undercuts defendant's position that it was inconsistent with her testimony at trial regarding to whom she gave her ring.

While defense counsel did demonstrate that Altairi's trial testimony was inconsistent with her written statement with respect to any threat of death, the initial problem here is that Altairi did not, indeed could not, read the written statement prepared on her behalf. She had to rely on someone else to ensure that the specific details of the event that she relayed were properly translated and written down, but she had no way to confirm the accuracy of the written statement. Thus, this matter does not necessarily address impeachment in its traditional sense. Nevertheless, even if defense counsel laid a proper foundation for extrinsic evidence of Altairi's prior inconsistent statement to be used to impeach her, the trial court's sustainment of the prosecutor's objection to its use constitutes harmless error.

There was significant evidence demonstrating that defendant was involved in the carjacking. A red vehicle, later identified as a Caprice Classic belonging to defendant, pulled up next to Altairi's Escalade. Altairi testified that defendant got out of the driver's side of the vehicle and was the individual who told her what to do. Altairi testified that defendant repeatedly said he needed money and, eventually, she gave him a gold ring. Altairi further testified that after she gave the ring to defendant, he told her and Alrayyashi to get back into her Escalade and follow him as he drove his vehicle, and instructed Murry to get into the Escalade with Altairi and Alrayyashi. Both Altairi and Alrayyashi positively identified defendant at trial and also both testified that defendant instructed Murry to kill them if they did not obey defendant's instruction. Altairi and Alrayyashi also testified there was no indication defendant was crying or seemed afraid, nor that Murry was forcing defendant to do anything against his will. Further, there was testimony defendant matched the description of one of the men involved in the carjacking, and the Heather Apartments that he went to shortly after the carjacking were in "very close proximity" to where the carjacking occurred.

Although there was testimony and audio recordings from the scene of defendant's arrest, indicating that defendant stated he had been robbed, the jury was free to weigh the credibility of defendant's claims that he made to those witnesses and believe or disbelieve his version of events. See *People v Unger*, 278 Mich App 210, 222; 749 NW2d 272 (2008) ("It is the jury's task to weigh the evidence and decide which testimony to believe."). And, as previously indicated, Altairi affirmatively testified that she told the police that there were threats against her life. The jury could have deemed her testimony credible and/or could have reasonably believed that certain aspects of Altairi's story were simply lost in translation, given that Altairi used an interpreter to translate and write her statement concerning the carjacking.

To the extent defendant raises the same issue with respect to Alrayyashi's statement, this issue is unpreserved. This Court reviews unpreserved issues for plain error affecting a defendant's

substantial rights. *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999). "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *Id.* at 763. Whether the error affected substantial rights "generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id.* Even if those elements are met, "[r]eversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Id.* at 763-764 (quotation marks and alterations omitted).

Contrary to defendant's assertion, Alrayyashi's written statement was not admitted as an exhibit at trial. Defense counsel also made no attempt to read Alrayyashi's statement at trial, nor did he raise the issue of impeachment with regards to Alrayyashi as he did with Altairi. Alrayyashi's statement was only presented at trial by the prosecution "for identification purposes."

At trial, Alrayyashi testified that although she remembered signing the statement, she did not write it because she does not know how to read and write in English, nor did she know what the statement said. Defendant takes issue with the fact that although Alrayyashi testified defendant took Altairi's ring and there were threats against her life and Altairi's, she neglected to include that information in her statement or the 911 call. But Alrayyashi explained that she expected Altairi to discuss her ring with the police, and she was "really tired, and scared" and "didn't know what [she] was saying, exactly." And, in any event, Alrayyashi's statement references the fact that once defendant and Murry approached them asking for cash, the two women "offered gold but they didn't take from me [sic]." Finally, as discussed with regards to Altairi's statement, there was substantial evidence demonstrating defendant's involvement in the carjacking at issue. Thus, were there any error with respect to Alrayyashi's statement defendant failed to establish that he was prejudiced by any such error.

Defendant also argues that by precluding the written statements of Altairi and Alrayyashi, the trial court denied him his right to confront the witnesses against him. We disagree.

The Confrontation Clauses of the United States Constitution and Michigan's 1963 Constitution guarantee defendants the right to confront the witnesses against them. US Const, Am VI; Const 1963, art 1, § 20. The Confrontation Clauses prohibit "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford v Washington*, 541 US 36, 53-54; 124 S Ct 1354; 158 L Ed 2d 177 (2004). Altairi and Alrayyashi both testified at trial and defendant had the opportunity to cross-examine them at trial (and did so). Therefore, defendant's argument that the trial court denied him his right to confront the witnesses against him by precluding the written statements of Altairi and Alrayyashi is without merit.

## III. *PEOPLE V CARPENTER*

Defendant argues that our Supreme Court's decision in *People v Carpenter*, 464 Mich 223; 627 NW2d 276 (2001), was wrongly decided and infringes on his due-process right to present a defense, specifically that of diminished capacity. In *Carpenter*, our Supreme Court held that a criminal defendant could not invoke the diminished-capacity defense because it was not intended

as part of the Legislature's statutory scheme regarding mental-illness defenses. *Carpenter*, 464 Mich at 236-241. The *Carpenter* Court stated:

> The Legislature has enacted a comprehensive statutory scheme setting forth the requirements for and the effects of asserting a defense based on either mental illness or mental retardation. We conclude that, in so doing, the Legislature has signified its intent not to allow evidence of a defendant's lack of mental capacity short of legal insanity to avoid or reduce criminal responsibility by negating specific intent. Rather, the insanity defense as established by the Legislature is the sole standard for determining criminal responsibility as it relates to mental illness or retardation. [*Id*. at 241.]

Therefore, the diminished-capacity defense is no longer viable in Michigan. See *Yost*, 278 Mich App at 354.

Despite defendant's invitation to disagree with the *Carpenter* Court, we decline to do so. This Court " 'is bound to follow decisions by [the Supreme] Court except where those decisions have clearly been overruled or superseded and is not authorized to anticipatorily ignore [Supreme Court] decisions where it determines that the foundations of a Supreme Court decision have been undermined.' " *People v Anthony*, 327 Mich App 24, 44; 932 NW2d 202 (2019), quoting *Associated Builders & Contractors v Lansing*, 499 Mich 177, 191-192; 880 NW2d 765 (2016) (alterations in original). In short, we are "bound by the rule of stare decisis to follow the decisions of our Supreme Court." *Duncan v Michigan*, 300 Mich App 176, 193; 832 NW2d 761 (2013). Therefore, this Court is bound by *Carpenter*.

## IV. *BRADY* VIOLATION

In his standard-4 brief, defendant argues the prosecution violated *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963), by withholding body-camera footage of his arrest until two weeks before trial, thus depriving him of the opportunity to contest anything regarding his arrest during his preliminary examination. We disagree.

"This Court reviews due process claims, such as allegations of a *Brady* violation, de novo." *People v Dimambro*, 318 Mich App 204, 212; 897 NW2d 233 (2016) (quotation marks and citation omitted; alteration omitted).

A *Brady* violation occurs when "(1) the prosecution has suppressed evidence; (2) that is favorable to the accused; and (3) [that,] viewed in its totality, is material." *People v Chenault*, 495 Mich 142, 155; 845 NW2d 731 (2014). "Evidence is favorable to the defense when it is either exculpatory or impeaching." *Id*. at 150. "To establish materiality, a defendant must show that there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. (quotation marks and citation omitted). Under *Brady*, "[t]he prosecution's failure to disclose exculpatory or material evidence in its possession constitutes a due-process violation regardless of whether a defendant requested the evidence." *People v Henry (After Remand)*, 305 Mich App 127, 157; 854 NW2d 114 (2014).

-7-

Defendant cannot complain that the evidence at issue was suppressed when he had actual knowledge of the evidence before and at trial. The gravamen of a *Brady* violation is the prosecution's failure to disclose favorable evidence within its control *unknown* to the defense. *Chenault*, 495 Mich at 150, 153; see also *Strickler v Greene*, 527 US 263, 281-282; 119 S Ct 1936; 144 L Ed 2d 286 (1999). Here, it appears the prosecution provided defendant with the body-camera footage approximately two weeks before trial. In fact, defendant concedes in his standard-4 brief that "[t]he bodycam was not surprressed [sic], but produced at the trial of the defendant against the *Brady* rule." Thus, defendant cannot assert that the prosecution completely withheld the body-camera footage.

Defendant nevertheless contends a *Brady* violation occurred because, although the prosecution provided defendant with the body-camera evidence in time for him to use at trial, the prosecution failed to provide the body-camera evidence to the defense before the preliminary examination. That is, defendant complains of a *delayed* disclosure of evidence, not a total deprivation of that evidence. If previously undisclosed evidence is disclosed, as here, during trial, no *Brady* violation occurs unless the defendant has been prejudiced by the delay in disclosure. See *People v Fox*, 232 Mich App 541, 549-550; 591 NW2d 384 (1998).

Defendant has failed to establish that was he prejudiced by the delayed disclosure of the body-camera footage. Although defendant asserts "[t]he defense was unable to dispute anything regarding the defendant['s] arrest durring [sic] the preliminary exam because the bodycam was withheld," he does not explain what he would have done differently if he was given more time to address the body-camera footage. Nor does defendant explain how, had the footage been given to him earlier, there would have existed a reasonable probability the outcome of his trial would have been different. Given defendant's failure to provide details regarding how he was prejudiced by the delayed disclosure of the body-camera footage and what he would have done differently if he had received it earlier, as well as the largely conclusory nature of defendant's arguments in his standard-4 brief, defendant has abandoned the issue. See *People v Kelly*, 231 Mich App 627, 640-641; 588 NW2d 480 (1998) ("An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment with little or no citation of supporting authority"); see also *People v McPherson*, 263 Mich App 124, 136; 687 NW2d 370 (2004) ("The failure to brief the merits of an allegation of error constitutes an abandonment of the issue.").

Affirmed.

/s/ Kathleen Jansen
/s/ Deborah A. Servitto
/s/ Michael J. Riordan